NO. 07-07-0157-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

APRIL 1, 2009

_____


CARL ALLEN CARTER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 31ST DISTRICT COURT OF WHEELER COUNTY;

NO. 4063; HONORABLE STEVEN R. EMMERT, JUDGE

_____


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


**OPINION**


Appellant, Carl Allen Carter, was convicted by a jury of possession of a controlled substance with intent to deliver in violation of section 481.112 of the Texas Health and Safety Code.  He was sentenced to twenty-five years confinement and fined $25,000. Appellant contends the trial court erred when it: (1) denied his motion to dismiss the

indictment due to racial profiling; (2) denied his motion to suppress evidence derived from an illegal arrest prompted by racial profiling; (3) denied his motion to suppress evidence derived from an illegal search prompted by racial profiling; (4) denied his request to present at trial a videotape of the arresting officer's entire shift as evidence of racial profiling; (5) denied his motion to suppress statements made after his arrest but prior to being read his *Miranda* warnings; (6) denied his motion for mistrial because statements made by him after being *Mirandized* were "fruit of the poisonous tree"; and (7) the evidence in support of the verdict is factually insufficient. We reverse the judgment of the trial court and remand for further proceedings in conformance with this opinion.

**Background**

On October 9, 2003, a Wheeler County Grand Jury returned an indictment charging Appellant with possession of 400 grams, or more, of cocaine with intent to deliver. On January 1, 2004, Appellant filed three motions to suppress evidence alleging that his car was illegally searched, his arrest was without probable cause, his admission/confession was taken when he was without counsel, and he had not intelligently and knowingly waived his rights.

**I.      Pre-trial Suppression Hearing**

Jason Henderson, a trooper for the Texas Department of Public Safety, was the sole witness at the hearing. He testified that, on March 31, 2003, he was patrolling

2

Interstate 40 when he observed a silver Pontiac traveling eastbound in the left hand lane next to the median. Trooper Henderson was traveling westbound on the opposite side of the median. As the two vehicles passed, Trooper Henderson made eye contact with the driver who then crossed over to the right lane and exited I-40 without a signal. Having observed two traffic violations, Trooper Henderson immediately cut across the median and activated his overhead lights.

Trooper Henderson next observed the driver run a stop sign as he made a left hand turn on Farm-to-Market Road 1443. Approximately one-half mile down the road, the driver pulled over onto the shoulder. Trooper Henderson called the Shamrock Police Department for assistance and pulled behind the vehicle. He approached and asked the driver, Craig Willis, for his license and registration. Willis did not have a driver's license. Appellant, a passenger, produced a rental contract showing he had leased the vehicle.

Trooper Henderson first spoke with Willis who told him they were coming from Tucson, Arizona, where his little brother played basketball. Subsequently, Appellant indicated they were coming from Phoenix, Arizona, where they had stayed at the Flamingo Hotel and a friend's house. Appellant indicated they had been there on vacation. Trooper Henderson asked if there were any weapons or narcotics in the car. Appellant responded, "Not that I know of, but it is a rental car, you never know." Appellant then agreed to permit Trooper Henderson to search the car.

3

Willis opened the trunk and Trooper Henderson observed laundry detergent was strewn over the trunk's floor. The trooper testified that laundry detergent is commonly used to mask the odor of narcotics. He also observed a high concentration of laundry detergent in the crease where the back seat met the floor of the trunk. He lifted the back seat and found two packages of cocaine concealed beneath the seat. He then placed Willis and Appellant under arrest.

Trooper Henderson testified that, after placing Appellant in his patrol car,[1] he advised him of his *Miranda* rights.[2] He further testified that, at that point, Appellant waived his rights and, in answer to the trooper's questions, stated the cocaine belonged to both him and Willis; they paid $8,000 for the drugs and they were trying to make some money off the drugs. Following Trooper Henderson's testimony, the trial court denied Appellant's motions to suppress.

---

[1] Willis was placed in the patrol car of Deputy Rick Walden.

[2] The safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), come into play when a person in custody is subjected to either express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). A confession may be deemed "involuntary" either through a failure to comply with article 38.22 of the Code of Criminal Procedure, noncompliance with the dictates of *Miranda*, or failure to comply with due process or due course of law because the confession was not freely given as a result of coercion, improper influences, or incompetency. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex.Crim.App. 1996). "When a defendant alleges that the *Miranda* protections were thwarted, the burden of showing admissibility rests on the prosecution." *Martinez v. State,* 272 S.W.3d 615, 623-24 (Tex.Crim.App. 2008).

## II. Motion To Dismiss

On July 5, 2003, Appellant filed a motion to dismiss the indictment wherein he alleged the traffic stop was racially motivated. Appellant argued the following evidence established that Trooper Henderson engaged in "racial profiling": (1) videotape segments depicting Trooper Henderson's other traffic stops the same day he stopped Appellant; (2) Trooper Henderson's testimony at the suppression hearing indicating he was traveling at a high rate of speed in the opposite direction on I-40 when he had "eye contact" with Willis from across the median; and (3) Trooper Henderson's initial observation that the two occupants of the suspect vehicle were black.

On the day of trial, March 26, 2007, the trial court again denied Appellant's motions to suppress evidence due to illegal arrest, illegal search, and involuntary confession. The trial court also denied Appellant's motion to dismiss and ordered the videotape of Trooper Henderson's entire shift, Defendant's Exhibit No. 1, sealed.[3]

---

[3]At the pre-trial suppression hearing, the State had sought the return of the videotape produced to Appellant's counsel during discovery. The videotape contained all of Trooper Henderson's traffic stops for the day Appellant was stopped and arrested. At the suppression hearing, the trial court admitted the videotape segment showing Appellant's traffic stop but "sealed" the remainder of the videotape pending a ruling on its admissibility. Because the State disclosed the entire videotape to Appellant and the trial court did not order the return of the tape, there was no *Brady* violation. *See Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex.Crim.App. 2002). Neither did the State commit any ethical violation, as argued by Appellant, because the State satisfied its duty of disclosure. *McFarland v. State,* 928 S.W.2d 482, 511 (Tex.Crim.App. 1996), *abrogated on other grounds by, Mosley v. State,* 983 S.W.2d 249, 263 (Tex.Crim.App. 1998).

### III.    The Trial

At trial, the State introduced a second videotape into evidence containing only Appellant's traffic stop.  Appellant objected because the videotape did not contain the other traffic stops, contained hearsay statements, and incriminating statements by Appellant prior to receiving a *Miranda* warning.  Appellant also re-urged the objections raised in his pre-trial motions.  The trial court again overruled Appellant's objections.

At trial, Trooper Henderson was qualified as an expert in criminal interdiction.  In addition to reiterating his testimony during the suppression hearing, he testified Interstate 40 was a well-known drug trafficking corridor with drugs running from west to east.  He testified that, when someone immediately exits the interstate after spotting him, it is generally because they are being evasive or attempting to throw something out of the vehicle.  The State then played the videotape of Appellant's traffic stop and he commented on the footage.  He testified that, while he was speaking with Willis and Appellant during the stop, they became increasingly nervous and looked away.  When Willis went to the trunk to look for his driver's license, the trooper observed and smelled laundry detergent spread throughout the car's trunk.  He testified laundry detergent is often used to mask the odor of narcotics from drug-detecting dogs.  All this, plus their inconsistent stories regarding their trip caused him to ask if he could search the car, and Appellant agreed.  Trooper Henderson then located two packages of cocaine in a storage compartment

6

underneath the back seat where additional laundry detergent was spread. The cocaine was wrapped with black electric tape and plastic.

After the cocaine was discovered, Appellant was arrested, handcuffed behind his back, and placed in the backseat of the trooper's patrol car where he could observe several deputies searching the vehicle. Shortly thereafter, Trooper Henderson entered the patrol car and started driving. From the patrol car's onboard video, the jury learned that, without giving Appellant any *Miranda* warnings, as Trooper Henderson turned his vehicle around in the roadway to proceed to the Shamrock Police Department, he questioned Appellant as follows:

| | |
|---|---|
| HENDERSON: | Y'all know what you are under arrest for, right? |
| APPELLANT: | Yes sir. |
| HENDERSON: | Is that cocaine or crack cocaine? |
| APPELLANT: | Cocaine. |
| HENDERSON: | It's cocaine? |
| APPELLANT: | Yes sir. |

At this point, Appellant's attorney objected:

| | |
|---|---|
| DEFENSE COUNSEL: | Judge, Objection - - |
| COURT: | Hang on. Hang on. Hang on. What? |
| DEFENSE COUNSEL: | I'm going to object to those two statements, he has not been Mirandized and he's under arrest. |
| COURT: | Overruled. Overruled. I don't know if he's been Mirandized or not. |

7

Shortly thereafter, at the request of a juror who was feeling ill, the court took a short recess. When the trial court returned from its recess, the following exchange occurred:

| | |
|---|---|
| COURT: | I want to advise the jury that during the break I was contemplating a ruling that I made previously. And [defense counsel] had objected to some of the statements that the defendant made on the videotape and I overruled this objection. I decided the better judgment on that one was to sustain his objection, so you're instructed to disregard and not consider for any purpose, the statement made by the defendant in the car on the video just before we took a break. Okay. |
| DEFENSE COUNSEL: | Your Honor, move for mistrial. |
| COURT: | Denied. |
| DEFENSE COUNSEL: | Your Honor, I'm going to object to any further statements based on the fact that he did it after he (was) Mirandized, the prior statements he had already incriminated himself and this is just further indication of the fact that he was not – the statements were not voluntary and he had already violated the rules, which is not as good as – |
| COURT: | Well, I don't – I don't – my understanding of *Miranda* is not that it – is that if you don't give it then nothing he ever says is admissible. It's anything he says prior to being Mirandized, once he's Mirandized would be admissible is my understanding of the rule. |
| DEFENSE COUNSEL: | Unless in this situation where he's already incriminated himself as to the fact that it was cocaine. |
| PROSECUTOR: | It's the State's position that the initial question asked by Trooper Henderson was simply a rhetorical question. It was not the result of custodial interrogation. Anything after *Miranda* |

|  |  |
|---|---|
|  | obviously then is the result of custodial interrogation. |
| COURT: | Okay. Well, in an abundance of precaution, I'll go ahead and rule as I did on the previous statement, but at this time any statements after he had been Mirandized would be admissible at this time, so your objection is overruled. |

Picking up again with the trooper's onboard video, the jury heard:

|  |  |
|---|---|
| HENDERSON: | You have not been advised of your rights so you don't have to say no more and I'll read your rights here in just a second. You are under arrest for possession of cocaine. Anything you say can be used in a court of law; you have a right to stop answering questions at any time; you have a right to an attorney; if you can't afford one, one will be appointed for you. You understand all these questions I covered with you today? |
| APPELLANT: | [Short inaudible period followed by Henderson's radio conversation describing the search and seizure of the cocaine] |
| HENDERSON: | How much is it? |
| APPELLANT: | Eighteen ounces. |
| HENDERSON: | Over a pound. |
| APPELLANT: | No sir, not a pound. |
| HENDERSON: | Sixteen ounces is a pound. |
| APPELLANT: | [Inaudible] |
| HENDERSON: | Where did you all pick it up, out there in Phoenix or where? |
| APPELLANT: | Phoenix. |
| HENDERSON: | [Description over the radio of the traffic stop and discovery of cocaine.] I got everything good to go . . . oh, cocaine . . . underneath the back seat |

9

|  |  |
|---|---|
|  | jammed up against the battery . . . underneath the back seat. |
| HENDERSON: | How much did you all pay for it? |
| APPELLANT: | Paid about $8,000. |
| HENDERSON: | You got any more money on you? |
| APPELLANT: | No sir. |
| HENDERSON: | Didn't bring any cash? |
| APPELLANT: | No sir. |
| HENDERSON: | Whose cocaine is it, yours or his? |
| APPELLANT: | I'm gonna say both of ours. |
| HENDERSON: | In on it together? |
| APPELLANT: | [Inaudible response] |
| HENDERSON: | Why did you all go out there to buy it? |
| APPELLANT: | He knows somebody out there, he's been out there before.  No, I don't buy it.  My friend buy it. |
| HENDERSON: | How much you plan on makin' off this? |
| APPELLANT: | I don't know, he said we could make a lot of money off of it.  I ain't never been in trouble anywhere. |
| HENDERSON: | Hey you never been arrested before today. |
|  | [short inaudible period] |
| HENDERSON: | Oh, you have.  Well I appreciate your cooperation and honesty.  That will explain your [inaudible]. |
| HENDERSON: | Which one of you all put it under the back seat? |

Commenting on the portion of the videotape where he gave Appellant his *Miranda* warnings, Trooper Henderson testified that Appellant acknowledged he understood and waived his rights.  Based upon Appellant's incriminating statements, Trooper Henderson further testified that, because Appellant and Willis had picked up the cocaine in Phoenix

10

where Willis had a connection, the trip was premeditated and they were involved in drug trafficking. He testified that its weight was significant to him "because it was a lot more [cocaine] than one person could use . . . which led me to believe his story after being Mirandized that it was going to be sold." He also testified that cocaine was usually sold by the gram for $900 and, after the cocaine was cut, Appellant and Willis would double, triple, or quadruple their money.

Brandon Conrad, a chemist with the Texas Department of Public Safety Crime Laboratory in Amarillo, next testified that the cocaine found in the Pontiac weighed 491.64 grams with a sixty-seven percent purity. Thereafter, the jury returned a verdict of guilty for possession of cocaine with intent to deliver, and the trial court entered its judgment.

**Discussion**

This appeal principally involves two events: Appellant's initial traffic stop and his subsequent admissions under questioning by Trooper Henderson prior to, and after, receiving *Miranda* warnings. Initially, Appellant contends the traffic stop was racially motivated and the result of profiling. As such, he asserts (1) the indictment should be dismissed; (2) all evidence resulting from the traffic stop should be suppressed because his arrest was illegal; (3) all evidence from the search of his car should be suppressed because the search was illegal; and (4) the trial court erred when it failed to admit the entire videotape of Trooper Henderson's shift that day. Next, Appellant contends the trial court erred when it failed to (5) suppress his confession made prior to receiving his *Miranda*

11

warnings; and (6) grant his motion for a mistrial due to the erroneous admission of statements he made after his confession that represented "fruit of the poisonous tree." Finally, Appellant asserts (7) the evidence in support of the verdict is factually insufficient.

A trial court's ruling on a motion to suppress is normally reviewed for abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002). The trial court's rulings receive almost total deference on questions of historical fact and the application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex.Crim.App. 2002). That said, we review *de novo* a trial court's ruling on a motion to suppress if that ruling simply involved an application of law to uncontroverted facts. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); *Hudson v. State,* 247 S.W.3d 780, 784 (Tex.App.–Amarillo 2008, no pet.).

As to issues five and six, credibility and demeanor were not issues because the facts regarding the interrogation were preserved on videotape and are completely uncontroverted. In effect, we are being asked to merely apply the law to uncontroverted facts to "review the question of the efficacy of the mid-stream *Miranda* warning *de novo*." *Martinez v. State,* 272 S.W.3d 615, 629-30 (Tex.Crim.App. 2008) (Price, J., concurring). *See State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App. 2000); *Mayes v. State,* 8 S.W.3d 354, 357 (Tex.App.–Amarillo 1999, no pet.).

## I. Suppression of Evidence – Issues (1), (2), (3) and (4)

### A. Racial Profiling – Motion to Dismiss

Although Appellant's motion was entitled a "Motion To Dismiss," its substance was directed toward having the trial court find that Appellant's traffic stop was racially motivated, suppress all evidence gathered as a result of the illegal stop and dismiss the indictment. Appellant argued that, because the stop was racially motivated, Trooper Henderson lacked reasonable suspicion or probable cause to stop the vehicle and, as a result, all evidence derived from the traffic stop should be excluded.

Peace officers are prohibited from engaging in racial profiling. Tex. Code Crim. Proc. Ann. art. 2.131 (Vernon 2005).[4] Evidence illegally obtained through racial profiling[5] may not be used against a defendant in a criminal trial. Art. 38.23(a). *See Pruneda v. State,* 104 S.W.3d 302, 305 (Tex.App.–Texarkana 2003, pet. ref'd). When a defendant asserts his arrest was based solely on racial profiling without probable cause or reasonable suspicion, the proper avenue for relief is a suppression motion. *Ex parte Brooks,* 97 S.W.3d 639, 640 (Tex.App.–Waco 2002, no pet.).[6] As a result, we find that, although

---

[4]For convenience, further citation to the Texas Code of Criminal Procedure will be as "art. ____" or "Art. ____".

[5]"Racial profiling" is defined as a "law enforcement-initiated action based on an individual's race, ethnicity, or national origin rather than on the individual's behavior or on information identifying the individual as having engaged in criminal activity." Art. 3.05.

[6]A motion to suppress is a specialized objection regarding the admissibility of evidence; *Hill v. State,* 643 S.W.2d 417, 419 (Tex.App.–Houston [14th Dist.] 1982), *aff'd,* 641 S.W.2d 543 (Tex.Crim.App. 1982), and suppression is the proper remedy when evidence is illegally obtained in violation of the defendant's rights. *Jackson v. State,* 717 S.W.2d 713, 715 (Tex.App.–San Antonio 1986, pet. ref'd).

Appellant's motion was entitled a "Motion to Dismiss," it is in substance a motion to suppress evidence due to racial profiling. *See Wade v. State,* 814 S.W.2d 763, 764-65 (Tex.App.–Waco 1991, no pet.) (substance of a motion is not determined by its title).

### B.   Search and Arrest

It is generally accepted that law enforcement officers may lawfully stop a motorist who commits a traffic violation. *McVickers v. State,* 874 S.W.2d 662, 664 (Tex.Crim.App. 1993), *superseded by statute on other grounds as stated in Granados v. State,* 85 S.W.3d 217, 227-30 (Tex.Crim.App. 2002); *Garcia v. State,* 827 S.W.2d 937, 944 (Tex.Crim.App. 1992). Here, Trooper Henderson testified that he stopped Appellant's car for failing to signal two lane changes; Tex. Transp. Code Ann. § 545.104 (Vernon 1999), and running a stop sign. *Id*. at § 545.010. His testimony regarding these traffic violations was uncontroverted. Thus, the trial court did not abuse its discretion in finding Trooper Henderson's traffic stop properly met state and federal constitutional requirements.

Furthermore, once the purpose of a traffic stop has been effectuated, it is not improper for an officer to ask the driver if he possesses any illegal contraband and then solicit his voluntary consent to search the vehicle. *Strauss v. State*, 121 S.W.3d 486, 491 (Tex.App.–Amarillo 2003, pet. ref'd). Trooper Henderson's testimony that he requested to search Appellant's rental car and Appellant voluntarily consented is also uncontroverted. As a result of the search, Trooper Henderson discovered two packages of cocaine hidden beneath the rear seat of the car and arrested Appellant. Accordingly, the trial court did not

14

abuse its discretion in finding Trooper Henderson's search of Appellant's car and Appellant's subsequent arrest were proper.

## C.     Racial Profiling – Exclusion of "Sealed" Videotape

Examination of an officer's subjective motive for a traffic stop is not a part of the court's evaluation of the reasonableness of a detention under search and seizure law. *See Crittenden v. State*, 899 S.W.2d 668, 674 (Tex.Crim.App. 1995) (traffic stop for failing to signal a lane change); *Garcia v. State*, 827 S.W.2d 937, 944 (Tex.Crim.App. 1992) (traffic stop for running a stop sign); *Russell v. State,* 904 S.W.2d 191, 198-99 (Tex.App.–Amarillo 1995, pet. ref'd) (traffic stop for defective brake light). Where, as here, the trooper's stop and detention was reasonable, the subsequent search of the vehicle was consensual and the arrest was supported by probable cause, the trooper's motives, licit or illicit, are irrelevant because "the exclusionary rule has no application and the intent with which [police officers] acted is of no consequence." *Garcia,* 827 S.W.2d at 943 (quoting *United States v. Causey,* 834 F.2d 1179, 1185 (5th Cir. 1987) (en banc)); *State v. West,* 20 S.W.3d 867, 872 (Tex.App.–Dallas 2000, pet. ref'd). "As long as the facts and circumstances show a valid and legal detention, it serves no actual Fourth Amendment function to attempt to unearth the subjective reasons for such detention." *Garcia,* 827 S.W.2d at 944.

Here, the uncontroverted evidence shows that, after noticing Trooper Henderson, Willis immediately changed lanes without signaling, exited the interstate, and subsequently ran a stop sign. Accordingly, the trial court did not abuse its discretion by denying

15

Appellant's motion to suppress evidence due to racial profiling or excluding the videotape segments of unrelated traffic stops. We overrule issues one through four.

## II.    Mid-Stream Miranda Warnings - Issues (5) and (6)

Appellant contends the trial court erred when it failed to (5) suppress his confession made prior to receiving his *Miranda* warnings; and (6) grant his motion for a mistrial due to the erroneous admission of statements he made after his confession that represented "fruit of the poisonous tree." We need not review Appellant's fifth issue because it is moot.[7]

Further, because the "fruit of the poisonous tree doctrine" does not apply to violations of the prophylactic requirements in *Miranda*; *Montemayor v. State*, 55 S.W.3d 78, 90 (Tex.App.–Austin 2001, no pet.) (quoting *Baker v. State*, 956 S.W.2d 19, 22 (Tex.Crim.App. 1997)), we review Appellant's sixth issue to determine whether his privilege against compulsory self-incrimination has been violated.[8] In that context, Appellant asserts that he was interrogated in "two stages" with the second stage being a "mere continuation" of the first interrogation, causing the *Miranda* warnings administered mid-stream to be meaningless under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643

---

[7]As Appellant aptly notes, the trial court initially overruled his objection to the admission of the unwarned statements, but subsequently reversed itself and issued a curative instruction. He does not assert the trial court's curative instruction was insufficient.

[8]Appellant preserved this issue for review. His contentions on appeal are consistent with the legal theory underlying his objection at trial and the totality of circumstances considered by the trial court in making its ruling. *See Krause v. State*, 243 S.W.3d 95, 103 (Tex.App.–Houston [1st Dist.] 2007, no pet.); *Hall v. State*, 74 S.W.3d 521, 524 n.3 (Tex.App.–Amarillo 2002, pet. denied); *Figueroa v. State*, 740 S.W.2d 537, 538 (Tex.App.–Houston [1st Dist.] 1987, pet. ref'd).

(2004) and *Jones v. State,* 119 S.W.3d 766 (Tex.Crim.App. 2003). The State contends Appellant's warned statements were admissible under *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), because Trooper Henderson's subsequent administration of *Miranda* warnings sufficed to remove the conditions that precluded admission of Appellant's unwarned statements.

### *Elstad*

In *Elstad*, the police went to the home of a juvenile suspect to take him into custody on a charge of burglary. While effectuating the arrest pursuant to a warrant, one of the officers stopped in the living room and spoke with the suspect's mother. In the course of that conversation, the officer asked the suspect if he was aware of why the officers were there to talk to him. After the suspect responded in the negative, one of the officers stated that he "felt" he was involved in a neighborhood burglary. In response to that statement, prior to being given any *Miranda* warnings, the suspect acknowledged that he had in fact been at the scene of the crime. Later, after having received his *Miranda* warnings, the suspect gave a more detailed account of his involvement in the crime. The juvenile suspect later argued that the second statement should be suppressed because it stemmed from the unwarned first statement. In holding the second statement admissible and voluntary, the *Elstad* Court determined that the officer's inadvertent failure to administer the warnings prior to obtaining an incriminating statement, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, was not

17

such conduct as would render the subsequent statement involuntary. *Elstad,* 470 U.S. at 318, n.5.

## *Seibert*

The limits of *Elstad* and the two-step process of obtaining an incriminating statement prior to being given *Miranda* warnings, and then obtaining a second incriminating statement after being *Mirandized*, were further examined by the Supreme Court in *Seibert.* During a custodial interrogation, without being given any *Miranda* warnings, after being questioned for approximately thirty to forty minutes, Patricia Seibert gave a confession concerning a homicide. After a twenty minute break, she was given *Miranda* warnings which she waived. After waiving her rights, the questioning officer confronted her with her pre-warning statements and obtained a second confession. *Seibert,* 542 U.S. at 605-06. In a plurality opinion,[9] the Supreme Court determined that a deliberate strategy of withholding *Miranda* warnings until after first questioning and obtaining a confession could render a postwarning confession inadmissible in those circumstances where the subsequent warning failed to function "effectively" as *Miranda* required. *Id.* at 617.

---

[9]Justice Souter delivered the opinion which was joined by Justices Stevens, Ginsburg, and Breyer. Justice Kennedy concurred in the judgment but drafted a concurring opinion wherein he indicated he would have decided the case on narrower grounds. *Seibert*, 542 U.S. at 618-622 (Kennedy, J., concurring).

### *Jones*

Approximately eight months before *Seibert*, the Court of Criminal Appeals reached a similar result in *Jones v. State*, 119 S.W.3d 766 (Tex.Crim.App. 2003). Jones, a suspect, was questioned twice about a murder while in custody. *Id.* at 771. Each time he received *Miranda* warnings prior to questioning and, after waiving his *Miranda* rights during the second interview, gave a written statement indicating he had committed the murder being investigated. *Id.* More than a week later, without being administered any *Miranda* warnings, Jones was interviewed by law enforcement officers about two *other* murders. Jones confessed and described his involvement in the two murders. As he did so, the investigating officer wrote down Jones's confession, asked questions, and eventually transcribed the statement. *Id.* at 772. When Jones had finished his account, the officer went over Jones's legal rights appearing at the top of the written form, read the statement with Jones, corrected any mistakes, had Jones initial any revisions, and eventually sign the statement at the bottom. *Id.*

On appeal, Jones argued that the officer's failure to inform him of his rights at the outset of the interrogation violated his right against self-incrimination under *Miranda*. *Id.* at 772. The State argued that, even though Jones was not warned until after he made his oral statement, his receipt of the required warnings before signing the statement rendered it voluntary and admissible under *Elstad*. *Id.* After examining the surrounding circumstances and the entire course of police conduct with respect to Jones in evaluating the voluntariness

19

of his written statement, the Court of Criminal Appeals could not place the subsequent

statement in the same category as the written statement at issue in *Elstad* because the

unwarned statement in *Elstad* was elicited almost inadvertently during a brief encounter with

the suspect's mother in the living room, and it was apparent that the officer's purpose was

not to interrogate the suspect, but to notify the suspect's mother of the reason for his arrest.

*Id.* at 773-74. Further distinguishing *Elstad*, the *Jones* Court stated as follows:

> By contrast, the circumstances in the instant case reflect, at the very least, a
> serious misunderstanding by law enforcement, not about whether appellant
> was in custody, but of the dictates of *Miranda*. Further, in contrast to *Elstad*
> where the initial unwarned statement took place at the defendant's home and
> the warned statement was given after transporting the defendant to the police
> station, *the unwarned and warned statements in this case were given during
> a nearly undifferentiated single event, taking place in the same room as an
> uninterrupted and continuous process*.

*Id.* at 775-76 (emphasis added).

Since the parties originally briefed and argued this appeal, the Court of Criminal

Appeals has had occasion to issue an opinion addressing the *Elstad - Seibert* dichotomy

of cases, thereby clarifying the circumstances under which *Seibert* applies when appellate

courts are asked to determine the efficacy of mid-stream *Miranda* warnings. *See Martinez

v. State,* 272 S.W.3d 615, 619-621 (Tex.Crim.App. 2008).[10]

---

[10]*Martinez* retroactively applies to this case because it was pending on direct appeal when the ruling
issued. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). *See Sammarron v.
State*, 150 S.W.3d 701, 706 n.6 (Tex.App.–San Antonio 2004, pet. ref'd).

20

### *Martinez*

Martinez was arrested by Officer Sosa in connection with a robbery and murder but did not receive any *Miranda* warnings. At the police station, Officers Sosa and Hernandez questioned Martinez about the crime. Shortly thereafter, Sosa and Hernandez took Martinez to a police polygrapher where he underwent a three to four hour test. Afterwards, Sosa and Hernandez resumed interrogation of Martinez. After telling Martinez that he failed the polygraph test, Sosa and Hernandez took Martinez to a municipal court where a magistrate informed him of his *Miranda* rights and other statutory warnings. Upon Martinez's prompt return to the central holding station, Sosa and Hernandez again questioned Martinez about the robbery and murder. Sosa repeated the *Miranda* warnings, and Martinez gave a videotaped statement incriminating himself. *Id.* at 618.

The majority's opinion [11] first determined that Sosa and Hernandez engaged in a two-step interrogation of Martinez calculated to undermine the subsequent *Miranda* warnings given by the Magistrate, and later at the station house by Sosa prior to the videotaped statement. 272 S.W.3d at 622-23. Their finding was premised upon the failure to warn Martinez at the time of his arrest–prior to subsequent questioning at the station house and the polygraph examination. Because the Magistrate's reading of the *Miranda* warnings came after Martinez's arrest, his first round of interrogation and the polygraph examination,

---

[11]The majority opinion was authored by Judge Johnson and joined by Judges Price, Womack, Holcomb, and Cochran. Judge Price also filed a concurring opinion. Judge Hervey filed a dissenting opinion in which Presiding Judge Keller and Judges Meyers and Keasler joined.

the *Martinez* Court concluded Sosa and Hernandez engaged in a two-step interrogation, as follows:

> Here, appellant was in custody for the purposes of *Miranda*; he gave both statements to law enforcement officials after his formal arrest pursuant to an arrest warrant, and both statements were given at the police station. This indicates that the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officer's mistaken belief that appellant was not in custody, but rather a conscious choice.

*Id.* at 624.

In *Martinez,* the Court recognized several relevant factors bearing on the determination of whether it would be reasonable to find that *Miranda* warnings delivered midstream in the interrogation process could "effectively" function as required. Those factors include: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the over-lapping content of the two statements, (3) the timing and setting of the first and second statements, (4) the continuity of law enforcement personnel, and (5) the degree to which the interrogator's questions treated the second round as a continuation of the first round. *See* id. at 620. *See also Seibert*, 542 U.S. at 601-02.

Because the same officers conducted both interrogation sessions and Martinez was in the presence of police personnel the entire day of his arrest, the majority rejected the State's assertion that there was a substantial break between the prewarning and postwarning interrogations. 272 S.W.3d at 624-25. The *Martinez* Court determined that,

22

although Martinez was read his *Miranda* warnings by the Magistrate and later at the station house before the videotaped statement, the warnings were ineffective because "[b]oth officers . . . failed to inform [Martinez] that, based on the lack of *Miranda* warnings, any prior statement made during the previous interrogation, including the polygraph exam, could not be used against him." *Id.* at 626. The *Martinez* Court further stated:

> [T]he officers had the responsibility to inform [Martinez] that the questions asked during the polygraph test, or the test results, could not be used at trial and that any mention of the test at trial was likewise prohibited. This, coupled with the fact that the officers initiated the conversation regarding the first interrogation, likely created the belief in [Martinez's] mind that he was compelled again to discuss the matters raised in the first interview during the second interview.

*Id.* at 626.[12]

The *Martinez* Court then determined that, where a deliberate, two-step strategy has been used, "postwarning statements related to the substance of prewarning statements

---

[12]In his concurring opinion, Judge Price noted that, once the interrogator has obtained an unwarned confession from a suspect, the interrogator "can count on getting its duplicate, with trifling additional trouble." 272 S.W.3d at 629 (quoting *Seibert*, 542 U.S. at 613). A suspect's likely reaction under circumstances similar to the instant case may be described as follows:

> Upon hearing the warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with the subsequent silence being of no avail.

*Id.*

23

must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* at 626-67. Because the officers did not apprise Martinez of his *Miranda* rights when they began the first custodial interrogation and failed to apply any curative measures in order to ameliorate the harm caused by the *Miranda* violation, the *Martinez* Court held that the subsequent videotaped statement was inadmissible. 272 S.W.3d at 627.[13]

## *Analysis*

Like the defendant in *Martinez*, Appellant was also subjected to a conscious, two-step interrogation without any curative measures being applied. Trooper Henderson was a highly experienced officer and an expert in criminal interdiction.[14] Within nine minutes of Appellant's arrest for possession of a controlled substance, being handcuffed behind his back, and placed in the backseat of the patrol car, Trooper Henderson began interrogating Appellant without giving him his *Miranda* warnings. Within three short questions spanning

---

[13]The dissenting opinion agreed with the majority that, if the police obtained an unwarned confession and then obtained a warned confession during a nearly continuous interrogation process in the absence of any "curative measures," the confession must be suppressed "since this confession will be considered to have been obtained without the requisite prophylactic *Miranda* warnings." 272 S.W.3d at 640 (citing *Seibert*, 542 U.S. at 622). However, noting that *Miranda* warnings were given by a Magistrate nearly an hour after the polygraph examination and again twenty-one minutes later at the station house prior to Martinez's videotaped statement, the dissenting Justices believed the record did not support a finding that Martinez had confessed during a nearly continuous and uninterrupted interrogation process. *Id.* at 641.

[14]At trial, Trooper Henderson testified he first received training when he worked for a sheriff's office in 1995. Since approximately 2001, he has been a DPS state trooper. While a trooper, he attended recruit school for twenty-seven weeks, successfully completed a one-year probation period, and completed hours of additional training in criminal interdiction. He testified that criminal interdiction goes way beyond the traffic stops he makes everyday and looks for indicators of criminal activity when people are stopped for traffic violations. He testified he had become a nationwide criminal interdiction instructor for other law enforcement agencies such as the highway patrol and routinely taught criminal interdiction courses. He testified he was certified as an expert in the field and has written the criteria for a number of forty-hour training courses.

approximately seventeen seconds, Trooper Henderson had the equivalent of a confession. In fact, he asked the same incriminating question twice knowing the answers were being recorded. Immediately after Appellant confessed, Trooper Henderson gave Appellant his *Miranda* warnings, and then, immediately resumed his interrogation related to the cocaine found in the car. Given Trooper Henderson's experience and expertise, we find that the absence of *Miranda* warnings at the beginning of Appellant's interrogation process was not based upon the trooper's mistaken belief that Appellant was somehow not entitled to a *Miranda* warning. Nor do we believe that his initial interrogation was a casual, rhetorical conversation. Someone of Trooper Henderson's experience certainly did not need Appellant to assist him in differentiating cocaine from crack cocaine. Based upon the facts of this case, we have concluded that Trooper Henderson's two-step approach was a conscious choice, calculated to undermine Appellant's *Miranda* rights.

Neither did Trooper Henderson administer any curative measures after his custodial interrogation yielded Appellant's unwarned confession. Rather, Trooper Henderson's pre-warning questions, though brief, yielded an incriminating statement and subsequent questioning, though simple, direct, and covering a short period of time, repeated the same confession. The content of the two statements was overlapping. The before-warning and after-warning statements both concerned Appellant's knowledge of and connection to the controlled substance found in the car. All Appellant's statements were made in the patrol car to the same officer within seconds of each other. Temporally and substantively, Trooper Henderson's questioning constituted a single, uninterrupted interrogation. Moreover,

25

Trooper Henderson made no attempt to tailor the *Miranda* warning he eventually gave to the particular situation and did not convey any distinction whatsoever between the statements that might come after the warning and those that came before.[15]

The instant case is a far cry from *Elstad* where the initial conversation took place in the suspect's living room with his mother nearby. *Elstad*, 470 U.S. at 305-06, 311-12. Rather, this case is more like *Seibert* where the defendant was under arrest and in custody but had not received any *Miranda* warnings. *Seibert*, 542 U.S. at 604-05.

Here, the circumstances reflect not only a serious misunderstanding regarding whether Appellant's unwarned statements were the result of custodial interrogation, but also of the dictates of *Miranda*. At the suppression hearing, Trooper Henderson testified that he had given Appellant his *Miranda* warnings after he was arrested but *prior to any custodial*

---

[15]Trooper Henderson ended his *Miranda* warning with the phrase, "[y]ou understand all these questions I covered with you today?" By this language, he essentially encapsulated Appellant's incriminating responses obtained during the unwarned interrogation within the warning and what was to follow afterwards. Under these circumstances, a rational inference would have been that Appellant's incriminating statements would be admissible in a court of law. Describing the "probable misimpression" a suspect might likely have under similar circumstances, the *Seibert* Court stated the following:

> When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation. . . . The impression that the further questioning was a mere continuation of the earlier questions and responses fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before.

*Seibert*, 541 U.S. at 616-17.

*interrogation*. Like the investigating officer in *Jones*, Trooper Henderson ostensibly believed *Miranda* warnings were unnecessary when he asked Appellant to identify the substance found. Further, when confronted with the videotape at trial showing Trooper Henderson's interrogation of Appellant actually began prior to the required warnings, the State argued that Appellant was not the subject of a custodial interrogation and Trooper Henderson's questions were merely "rhetorical," *i.e.,* unintended to elicit a response from Appellant. On appeal, however, the State now admits that, because Appellant was under arrest when he made the unwarned admissions, those statements were inadmissible at trial.

Further, the circumstances attendant to Appellant's unwarned and warned interrogation were more coercive than the circumstances of the defendant's interrogations in either *Seibert* or *Jones*. Here, there was little, or no, time buffer between Appellant's arrest and Trooper Henderson's interrogation. Unlike either *Seibert* or *Jones*, Appellant had not been transported to a police station and placed in an interrogation room before being questioned. Rather, Appellant was sitting in the backseat of a police car, with his hands handcuffed behind his back, at the crime scene, looking out through a metal grill where a number of law enforcement officers were searching his vehicle. Moreover, Trooper Henderson's subsequent warned interrogation was punctuated by radio descriptions of the car's search, the seizure of the cocaine, and Appellant's arrest. At one point, after Appellant had already made incriminating statements, Trooper Henderson radioed in a

27

more detailed description of the location where the cocaine was found in the car and then immediately resumed his interrogation.[16]

The State places a great deal of reliance upon two cases, *United States v. Carrizales-Toldedo,* 454 F.3d 1142 (10th Cir. 2006) and *United States v. Yamba,* 407 F.Supp. 703 (W.D. Pa. 2006), for support of its position that reflexive questions, not intended as interrogation, did not render subsequent incriminating statements inadmissible. These cases either support our decision or are inapposite. In both cases, the unwarned statements were in response to an officer's open-ended questions such as "What are you doing?" and "What are these?" that were contemporaneous with the discovery of the contraband in *Carrizales-Toledo;* 454 F.3d at 1152*,* and stolen credit card numbers in *Yamba*, 407 F.Supp.3d at 718-19. Trooper Henderson's questions were neither open-ended nor contemporaneous with the discovery of the contraband. Rather, his questions were pointed, direct, and asked after he had sufficient time to assess the situation and plan his interrogation strategy. Further, in *Carrizales-Toledo*, it was unclear whether the suspect was in custody when first statements were made. The Tenth Circuit ultimately determined that the suspect's initial statements were voluntary and his subsequent statements were made after being properly *Mirandized;* 454 F.3d at 1153. Furthermore, the court in *Yamba*

---

[16]Although we generally only consider evidence adduced at the suppression hearing because the trial court's ruling is based on what is heard at the hearing rather than on evidence introduced at trial, here the trial court *sua sponte* decided to re-visit its prior rulings in light of Trooper Henderson's changed testimony and the contents of the videotape while the parties subsequently re-litigated the evidence and the issues. *See White v. State*, 201 S.W.3d 233, 239-240 (Tex.App.–Fort Worth 2006, pet. ref'd).

ultimately determined that the officer's spontaneous query was inadvertent and the suspect's response was innocuous. 407 F.Supp.2d at 718.

Here, as in *Seibert* and *Jones*, Appellant's unwarned and warned statements were made while he was in custody during an undifferentiated single event, taking place in Trooper Henderson's patrol car as an uninterrupted and continuous interrogation process. At no time were any curative measures taken to ameliorate the harm caused by the *Miranda* violation. Under the circumstances presented here, considering all of the relevant factors, it is clear that the *Miranda* warnings could not have functioned effectively. The two-step interrogation technique had the likely effect of undermining both Appellant's ability to assert his right to remain silent and his ability to knowingly, voluntarily, or intelligently waive that right. Accordingly, all post-warning statements made by Appellant to the trooper should have been suppressed in the State's case-in-chief.

**Harm Analysis**

Having found that the trial court erred in admitting Appellant's warned statements, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. Because a correct ruling in this instant is constitutionally required under *Miranda; see Dickerson v. United States*, 530 U.S. 428, 439-40, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the error is constitutional error; *see Alford v. State*, 22 S.W.3d 669, 673 (Tex.App.–Fort Worth 2000, pet. ref'd), and Rule 44.2(a) is applicable. Thus, we evaluate the entire record in a neutral, impartial, and even-handed manner, not

29

in the light most favorable to the prosecution; *id.* at 586; *Kane v. State*, 173 S.W.3d 589, 594 (Tex.App.–Fort Worth 2005, no pet.), and must reverse unless we determine beyond a reasonable doubt that error did not contribute to Appellant's conviction or punishment. *Alford,* 22 S.W.3d at 673. We consider the source and nature of the error, the extent it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989). We do not focus on the propriety of the outcome, but calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001).

In a possession with intent to deliver case, the State must prove that the defendant: (1) exercised care, custody, control, or management over the controlled substance*,* (2) intended to deliver the controlled substance to another, and (3) knew that the substance in his possession was a controlled substance. *See* Tex. Health & Safety Code Ann. §§ 481.002(38) (Vernon 2003 & Supp. 2008), 481.112(a) (Vernon 2003); *Nhem v. State*, 129 S.W.3d 696, 699 (Tex.App.–Houston [1st Dist.] 2004, no pet.).

When, as here, the accused is not in exclusive possession of the place where the contraband is found, there must be additional, independent facts that link him to the contraband in such a way that it can be concluded that the accused had knowledge of the

30

contraband and exercised control over it. *See Guiton v. State*, 742 S.W.2d 5, 8 (Tex.Crim.App. 1987) (heroin concealed inside chair cushion in rented room); *Presswood v. State*, 548 S.W.2d 398, 399-400 (Tex.Crim.App. 1977) (marihuana concealed in glove compartment of a borrowed car).

Intent to deliver may also be proven by circumstantial evidence. *See Garrett v. State*, 161 S.W.3d 664, 671 (Tex.App.–Fort Worth 2005, pet. ref'd). Courts have considered several factors in determining intent, including (1) the nature of the location where the accused was arrested (known drug-dealing or high crime area), (2) the quantity of contraband in the accused's possession (between 1,000 and 3,013 grams of cocaine),[17] (3) the manner of the packaging (individual packets or units for resale), (4) the presence or absence of drug paraphernalia (for use or sale), (5) whether the defendant possessed a large amount of cash in addition to the drugs (typically in denominations indicative of multiple drug sales), and (6) the defendant's status as a drug user. *See Jordan v. State*, 139 S.W.3d 723, 726 (Tex.App.–Fort Worth 2004, no pet.). Expert testimony by experienced law enforcement officers may also be used to establish an accused's intent to deliver. *See Morrow,* 757 S.W.2d at 488.

---

[17]*See Morrow v. State*, 757 S.W.2d 484, 488 (Tex.App.–Houston [1st Dist.] 1988, pet. ref'd), *cert. denied*, 493 U.S. 921, 110 S.Ct. 285, 107 L.Ed.2d 265 (1989) (3,013 grams of cocaine); *Pitts v. State,* 731 S.W.2d 687, 692 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd) (1,025 grams of cocaine); *Hurtado v. State*, 722 S.W.2d 184, 189 (Tex.App.–Houston [14th Dist.] 1986, no pet.) (over 1,000 grams of cocaine); *Vasquez v. State*, 699 S.W.2d 294, 296 (Tex.App.–Houston [14th Dist.] 1985, no pet.) (over twenty-three thousand capules of mandrax).

The record before us is clear that reversal is warranted. Appellant's confession was the very cornerstone of the State's case. In its opening statement, the State connected Appellant with the cocaine found in the car through his "voluntary acknowledge[ment] that he was, in fact, in possession of the cocaine," and promised to establish its case through Appellant's statements telling Trooper Henderson "where he was, where he went to get [the cocaine] and where they were headed." The State's entire case rested on Trooper Henderson's testimony,[18] the onboard videotape of the traffic stop, and Appellant's responses to Trooper Henderson's interrogation. The State played Appellant's videotaped responses to Trooper Henderson's questions and argued that they amounted to a complete confession of every element of the crime being tried. In fact, there is no question that Appellant's responses to Trooper Henderson's questions are thoroughly incriminating.

A confession such as Appellant's is "generally likely to have a profound impact on a jury, especially at the guilt stage of a trial." *Jones*, 119 S.W.3d at 783 (citing *McCarthy v. State*, 65 S.W.3d 47, 56 (Tex.Crim.App. 2001), *cert. denied*, 536 U.S. 972, 122 S.Ct. 2693, 153 L.Ed.2d 862 (2002). *See Arizona v. Fulminante*, 499 U.S. 279, 292, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ("a defendant's confession is probably the most probative and damaging evidence that can be admitted against him"). This is particularly so here

---

[18]The State's only other witness was Brandon Conrad, the State's chemist who testified the substance found in the car was 491.64 grams of cocaine.

where there is virtually no other testimony or physical evidence linking Appellant to the contraband or establishing that he intended to deliver the contraband to someone else.[19]

Although the State correctly cites Rule 44.2 of the Texas Rules of Appellate Procedure for the applicable standard of review, the State asserts only that sufficient evidence of Appellant's possession of cocaine was adduced from which the jury could have concluded that Appellant was in *possession* of a controlled substance. The State does not address the "intent to deliver" element. In support of its assertion that any error was harmless, the State relies upon *Akins v. State,* 202 S.W.3d 879, 890-91 (Tex.App.–Fort Worth 2006, pet. ref'd.). Although the defendant in Akins was charged with possession with intent to deliver, the improperly admitted evidence went *only* to the issue of Akin's possession of a controlled substance. *See id.* at 891-92. The State argues that the following evidence of possession presented at trial is sufficient to render any error harmless: (1) Appellant rented the car in which the cocaine was found; (2) he and the driver were traveling a well-known drug corridor; (3) both men were nervous during the stop; (4) their stories were inconsistent; (5) Appellant's luggage was in the trunk where laundry detergent had been spread; and (6) there was a large amount of cocaine found under the backseat. While these facts may arguably be sufficient to link Appellant to the controlled substance,

---

[19]At trial, the State's case against Appellant for "intent to deliver" hinged almost entirely on Appellant's incriminating statements. While a large amount of drugs such as 1,000 grams of cocaine or 23,000 narcotic pills, coupled with expert testimony, can show intent to deliver, such amounts are not involved here. In this case, we have 491 grams of cocaine found in a vehicle with a driver and a passenger. Further, there is no evidence that Appellant: possessed an excessive amount of cash much less any cash at all; the cocaine was packaged in a manner indicating intent to sell; Appellant possessed any baggies, scales, or other items used in sales or transactions involving drugs; Appellant was arrested in an area known for drug sales; Appellant had any weapons in the car; or that Appellant attempted to flee.

there is little, if any, meat on these bones inso far as the "intent to deliver" element. *See supra*, n.19. The jury almost certainly relied on Appellant's confession to convict.

The question, here, is not whether sufficient evidence to convict existed without the confessions, "but whether there is a reasonable possibility that the erroneously admitted evidence contributed to the verdict obtained." *Jones v. State*, 883 S.W.2d 118, 127 (Tex.Crim.App. 1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993). Having reviewed the entire record, we cannot say beyond a reasonable doubt that the error made no contribution to Appellant's conviction. Accordingly, although Appellant's fifth issue is moot, his sixth issue is sustained. Appellant's remaining issue is pretermitted.

**Conclusion**

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

Patrick A. Pirtle
Justice

Publish.

34