PD-0178-15

PD-0178-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/13/2015 2:43:17 PM
Accepted 2/13/2015 3:21:11 PM
ABEL ACOSTA
CLERK

# No. _____

In the

# Texas Court of Criminal Appeals

At Austin

———————◆———————

## No. 14-13-00957-CR

In the Court of Appeals for the
Fourteenth District of Texas
at Houston

———————◆———————

# CORREY OLIVER

*Appellant*

V.

# THE STATE OF TEXAS

*Appellee*

———————◆———————

# STATE'S PETITION FOR DISCRETIONARY REVIEW

———————◆———————

FILED IN
COURT OF CRIMINAL APPEALS

February 13, 2015

ABEL ACOSTA, CLERK

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
Texas Bar No. 24000608
caird_jessica@dao.hctx.net

Harris County Criminal Justice Center
1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713/755-5826
FAX No.: 713/755-5809
*Counsel for Appellee*

ORAL ARGUMENT NOT REQUESTED

# STATEMENT REGARDING ORAL ARGUMENT

In the event this Honorable Court grants the State's petition for discretionary review, the State requests oral argument for the following reasons:

The Fourteenth Court of Appeals' opinion incorrectly concluded that the subjective beliefs of the officer held during a search were determinative of any exception that might apply rather than applying all law applicable to the case and utilizing all the information known to law enforcement at the time when determining the justification for the search. Moreover, it misapplied the standard for harm by ignoring the overwhelming weight of the evidence supporting guilt and the lack of impact the admitted evidence could have had on the jury. Its misapplication of this Court's binding precedent on search and harm is heavily fact bound and requires an intensive review of the record which oral argument would facilitate. The State respectfully requests that the Court permit oral argument.[1]

---

[1] *See* TEX. R. APP. P. 68.4(c).

i

# IDENTIFICATION OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), a complete list of the names of all interested parties is provided below:

*Counsel for the State:*

**Devon Anderson**—District Attorney of Harris County

**Lisa C. McMinn**—State's Prosecuting Attorney

**Jessica Caird**—Assistant District Attorney on appeal

**Justin Keiter & Joseph Allard**—Assistant District Attorneys at trial

*Appellant or criminal defendant:*

**Correy Oliver**

*Counsel for Appellant:*

**Chip B. Lewis & Alicia Devoy O'Neill**—Attorneys at trial and on appeal

*Trial Judge:*

**Honorable Ryan Patrick**—Judge Presiding

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ......................................................i

IDENTIFICATION OF THE PARTIES..........................................................................ii

TABLE OF CONTENTS ...............................................................................................iii

INDEX OF AUTHORITIES......................................................................................... iv

STATEMENT OF THE CASE ....................................................................................... 1

STATEMENT OF THE PROCEDURAL HISTORY ................................................... 2

STATEMENT OF FACTS .............................................................................................. 2

STATE'S GROUNDS FOR REVIEW ......................................................................... 9

    **1. The Court of Appeals erred by finding the subjective beliefs of the testifying officer regarding exigency controlled over the totality of the circumstances objectively known to law enforcement when police searched appellant's cell phone.**

    **2. The Court of Appeals misapplied the harm standard by finding a text message stating, "U got some oil" constitutionally harmful when it related only to the charge for which appellant was acquitted in the same trial.**

REASONS FOR GRANTING REVIEW....................................................................... 10

STATE'S FIRST GROUND FOR REVIEW ............................................................... 10

STATE'S SECOND GROUND FOR REVIEW.......................................................... 16

PRAYER ........................................................................................................................ 21

CERTIFICATE OF SERVICE AND WORD LIMIT COMPLIANCE.................... 22

APPENDIX A................................................................................................................ 23

# INDEX OF AUTHORITIES

**CASES**

*Bond v. United States*,
    529 U.S. 334 (2000) ................................................................................................. 13

*Brigham City, Utah v. Stuart*,
    547 U.S. 398 (2006) ............................................................................................13, 14

*Brimage v. State*,
    918 S.W.2d 466 (Tex. Crim. App.  1994) ........................................................10, 11, 12

*Carter v. State*,
    419 S.W.3d 1 (Tex. App.—Amarillo 2009, pet. granted)
    *overruled by* 309 S.W.3d 31 (Tex. Crim. App. 2010) ........................................................ 17

*Colburn v. State*,
    966 S.W.2d 511 (Tex. Crim. App.  1998) .................................................................. 11

*Garcia v. State*,
    827 S.W.2d 937 (Tex. Crim. App.  1992) ..............................................................10, 11

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................................................. 13

*Janicek v. State*,
    634 S.W.2d 687 (Tex. Crim. App. 1982) ..............................................................10, 11

*Laney v. State*,
    117 S.W.3d 854 (Tex. Crim. App. 2003) ..............................................................11, 12

*Mincey v. Arizona*,
    437 U.S. 385 (1978) ................................................................................................. 12

*Missouri v. McNeely*,
    569 U.S. ___, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013) ................................................ 15

*Oliver v. State*,
    No. 14-13-00957-CR (Tex. App.—Houston
    [14th Dist.] Jan. 22, 2015, no pet. h.)
    (mem. op., not designated for publication) .............................. 2, 11, 14, 17, 18, 19, 20

*Riley v. California*,
__ U.S. __, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) ................................. 15

*Scott v. United States*,
436 U.S. 128 (1978) ............................................................................. 13

*Snowden v. State*,
353 S.W.3d 815 (Tex. Crim. App. 2011) .......................................10, 19, 20

*State v. Sheppard*,
271 S.W.2d 281 (Tex. Crim. App. 2008) ...................................14, 15

*Unites States v. Wallen*,
388 F.3d 161 (5th Cir. 2004) ............................................................. 15

*Warden Md. Penitentiary v. Hayden*,
387 U.S. 294 (1967) ........................................................................... 16

*Welch v. Wisconsin*,
466 U.S. 740 (1984) ........................................................................... 12

**RULES**

TEX. R. APP. P. 38.2(a)(1)(A) ................................................................ ii

TEX. R. APP. P. 66.3 ............................................................................. 10

TEX. R. APP. P. 68.2(c) ......................................................................... 2

TEX. R. APP. P. 68.4(c) .......................................................................... i

**TREATISES**

40 Dix & Dawson,
TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 12.11 (2d ed. 2001 &
Supp. 2003) ....................................................................................... 11

v

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

## STATEMENT OF THE CASE

The State charged appellant by indictment with the felony offenses of possession of a controlled substance with intent to deliver more than 400 grams of cocaine, and possession with intent to deliver codeine weighing at least 400 grams as a penalty group four controlled substance.[2] Appellant pled not guilty to each charge.[3] At the conclusion of the trial, the trial judge granted appellant's motion for a directed verdict in regard to the codeine case, but the possession of cocaine charge went to verdict, and the jury found him guilty.[4] On an agreed plea, appellant pled true to both enhancements, the trial court sentenced him to 45 years incarceration in the Texas Department of Criminal Justice, and it assessed a $1,000 fine.[5] Appellant filed written notice of appeal the same day.[6]

———————◆———————

---

[2] (CR-12; RRIII-16-17);
The appellate record consists of the following:
    CR-Clerk's Record;
    RRI-RRVI Court Reporter's Record from September 28 through October 3, 2013, prepared by Linda Hacker.
[3] (RRIII-16-18).
[4] (CR-138; RRIV-107, 111, 148).
[5] (CR-141; RRV-4-8).
[6] (CR-144).

## STATEMENT OF THE PROCEDURAL HISTORY

On January 22, 2015, the Fourteenth Court of Appeals issued an unpublished opinion in which it reversed and remanded the matter for a new trial.[7]  The State now timely files its petition for discretionary review in accordance with Texas Rule of Appellate Procedure 68.2(a).

———————◆———————

## STATEMENT OF FACTS

As Houston Police officers monitored a high crime area on May 3, 2012, they encountered appellant and his driver.[8]  A plain-clothes officer noticed appellant's car windows did not meet the legal visibility requirements, and he observed the driver change lanes without signaling.[9]  Uniformed officers caught up with the car and identified it by plate number.[10]  Appellant and a woman were the registered owners.[11] Officers performed a traffic stop, they approached the car, and they identified Michael Floyd as the driver and appellant as the passenger.[12]  The officer noticed a prescription bottle with a label on it in the front cup holder along with two cups of

---

[7] *Oliver v. State*, No. 14-13-00957-CR, slip op. at 2 (Tex. App.—Houston [14th Dist.] Jan. 22, 2015, no pet. h.) (mem. op., not designated for publication).

[8] (RRIII-21, 23, 24, 26, 31, 45-47).

[9] (RRIII-30-32, 35-36).

[10] (RRIII-43, 45).

[11] (RRIII-46-47).

[12] (RRIII-50-51, 53, 58-59).

red soda and ice.[13]  Based on his training and experience, he knew people often mixed codeine cough syrup with a fruity, red soda.[14]

The officer obtained consent to search the car.[15]  The prescription bottle had appellant's name taped onto it, but without part of the label.[16]  Someone had issued it seven to eight months before the date of the traffic stop, which raised more suspicions for the officer.[17]  Police performed a systemic search of the car and found on the backseat floorboard a bag in easy reach of appellant just behind the driver's seat.[18]  It contained multiple manufacturer bottles of codeine, not the kind released to the end customer, but ones provided to a pharmacy.[19]  Seals protected the lids showing no one had yet opened the bottles.[20]

The same bag contained powder cocaine that someone had chipped off a brick in two large, hard chunks.[21]  It had not been broken up or diluted in any way.[22]  The officer estimated the amount at about a kilo, but later testing totaled 654.7 grams.[23]  The chemist received it in two large amounts, the first weighing 100.4 grams and the

---

[13] (RRIII-54).
[14] (RRIII-57-58).
[15] (RRIII-62).
[16] (RRIII-61).
[17] (RRIII-61).
[18] (RRIII-64-65, 66).
[19] (RRIII-68-69).
[20] (RRIII-68, 70).
[21] (RRIII-73).
[22] (RRIII-72; RRIV-70-71).
[23] (RRIV-70, 71).

second 554.3 grams.[24]  Powder cocaine usually sold to the end user for roughly $100 per gram, so the officer concluded that the amount found in the car was clearly not for appellant's personal use.[25]  The bag contained a far greater amount than he usually encountered while working routine patrols, and the chemist considered it a large amount by her standards because she did not commonly encounter over 500 grams of cocaine on one case.[26]

The police located two prescription receipts using appellant's name in the car.[27] The first was for Amoxicillin dated October 27, 2011, and the second for a twelve-day supply of a promethazine/codeine mixture dated the same day.[28]  He concluded the prescriptions related only to the front seat bottle, not those found in the bag.[29]

Although police initially put the two men in different patrol cars, they decided to put them together in one backseat while surreptitiously recording them.[30]  When the officer took the bag with the drugs over to the car where the two suspects sat, he saw Floyd on a cellular telephone, and he noticed appellant manipulating another cell phone by pressing buttons but not speaking on it.[31]  Apparently, appellant had two cellular phones during the stop, but unaware of the second phone the officer initially

---

[24] (RRIV-66, 68, 69, 70-71).
[25] (RRIV-75).
[26] (RRIII-80; RRIV-72).
[27] (RRIII-82, 83, 84).
[28] (RRIII-84; State's Exhibit No. 15, 16).
[29] (RRIII-84, 86-87).
[30] (RRIII-62, 87-89).
[31] (RRIII-77, 129-130, 150).

4

confiscated only the first phone until he saw appellant punching numbers on the second.[32] In the officer's experience, drug dealers often used cellular phones to communicate about their business.[33] He thought the second phone likely contained specific communications about the sale of the narcotics found in the car, and that appellant could easily destroy those communications when in had possession of it.[34]

During the pretrial hearing and in the motion to suppress, the defense argued that the officer should have turned off the phone, pulled out the SIM card, and then gone for a warrant before reviewing the cellular phone.[35] The State responded that the texts were "certainly destructible evidence" because the officer noted how many text messages he had already deleted from the phone by the time he took it from appellant.[36] The prosecutor relied on the destructibility of the evidence to justify the search incident to arrest.[37] He explained that the officer could not tell which phone belonged to which defendant, and their using the telephones while inside the patrol car complicated the matter.[38] The trial court initially granted the defense's motion in limine, but invited the State to lay the groundwork for admission during the hearing.[39]

---

[32] (RRIII-100, 149, 181).
[33] (RRIII-89).
[34] (RRIII-78).
[35] (RRIII-8).
[36] (RRIII-11).
[37] (RRIII-11-12).
[38] (RRIII-13).
[39] (RRIII-13).

The surreptitious recording included the officers discovering both men using the hidden phones, and the trial judge heard the entirety of the recording as part of the suppression hearing.[40] On the recording, Floyd mentioned to the officer that he had already called someone to take the car, but the officer wanted to know how he called someone, saw the phone, and demanded to know where appellant had his other phone.[41] Appellant lied and claimed he did not have a second phone, that he only had the one already confiscated, but the officer repeatedly tried to find out whom the men called and if the people they called were coming to the scene.[42] The officer reviewed Floyd's phone to find the recently called numbers and explained he had to call the person back to tell them not to come.[43] Both men had given specific direction to their location during the calls to people already headed to the scene.[44] It was almost immediately after Floyd gave additional directions to those people that the officer realized he had been speaking on the phone during the arrest.[45] The officer also soon discovered appellant manipulating the second, hidden cell phone.[46]

Appellant's second phone was a "flip phone" where the screen illuminated when opened with a separate "in/out box" for messages sent versus those received.[47]

---

[40] (RRIII-95-96, 104, 126-127; State's Exhibit No. 18).
[41] (State's Exhibit No. 18).
[42] *Id.*
[43] (State's Exhibit No. 18).
[44] *Id.*
[45] *Id.*
[46] *Id.*; (RRIII-77, 149-150).
[47] (RRIII-150).

The officer searched appellant's second phone after he saw appellant manipulate it.[48]

He checked the message inbox and found a message stating, "U got some oil"[49] that

he understood to mean the person wanted codeine syrup because it went by the street

name of "oil."[50] But the officer found very little information on the phone after

appellant had been punching numbers on it for an unknown period of time.[51]

Also during the tape-recorded conversation between appellant and Floyd,

appellant complained he "won't do it again."[52] Floyd agreed appellant could not

"afford to go out like this" because he had too much going on, but he wanted

appellant to "just get [him] out[.]"[53] Appellant said he would tell Floyd "everything"

and he whispered to him.[54] Floyd then offered to "just tell them [he] was dropping

[his] girlfriend at the Cross….and picked [appellant] up."[55] Appellant explained that

Floyd would "get probation" and Floyd asked appellant how much "work" he had, to

which appellant answered "like a half," but appellant complained one of the baby

bottles had his name on it.[56] A trained narcotics officer explained that drug dealers

---

[48] (RRIII-150-151).

[49] In the record, it appears as "You got some oil." The photograph shows the text says, "U
got some oil", without any punctuation included.

[50] (RRIII-57, 150-151, 153).

[51] (RRIII-149-150, 151).

[52] (RRIII-140; State's Exhibit No. 18).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

7

commonly used the term "work" for drugs they sold.[57] Floyd claimed he was "fixing to tell [the police] it's all [his]."[58] Floyd then gave an inculpatory statement to police, but based on their observations and listening to the tape, the officers did not believe him, and concluded the drugs belonged to appellant.[59] Floyd also demonstrated his lack of knowledge about the drugs by claiming the car contained only two codeine bottles when police found six.[60]

Police found $1,126 in cash kept in two of appellant's pockets in denominations twenties, tens, fives, and ones.[61] The officer considered the denominations consistent with street-level sale of the drugs.[62] When asked before they counted it, appellant knew it was "[a]bout thousand[.]"[63] A drug dog later alerted on the money, and that indicated the money had the odor of narcotics on it.[64] After the officer told appellant they planned to take him to jail, appellant asked why, and in response to the explanation that he possessed cocaine and codeine appellant commented, "I'm going to do what I do no matter what you do."[65]

---

[57] (RR-194; RRIV-7-8).

[58] *Id.*

[59] (RRIII-146, 172-173, 177, 180, 191-192).

[60] *Compare* (State's Exhibit No. 18)(claiming two bottles of codeine) *with* (RRIII-14, 67, 68, 69, 70; State's Exhibit No. 12, 13, 14) (showing police discovered six bottles).

[61] (RRIII-145-147).

[62] (RRIII-145-147).

[63] (RRIII-182-183).

[64] (RRIII-195, 198, 203).

[65] (RRIII-157-158).

A criminalist for the Houston Police Department Crime Lab tested the cocaine and the codeine.[66] The purple liquid contained codeine and promethazine, but no one requested that she perform a quantitative analysis of the amounts in the liquid.[67] She testified to the therapeutic properties of codeine and promethazine, and that the syrup required a prescription from a doctor.[68] The trial court ultimately concluded that the chemist could not testify to the information she received from the manufacturer's specifications of the known drug's composition, specifically to the proportion of promethazine to codeine in it.[69]

At the conclusion of the trial, the defense sought a directed verdict on the codeine case because it argued the chemist's testimony was not sufficient as a matter of law to prove the proportions of the codeine and promethazine as necessary to sustain the charge.[70] The trial court granted the motion and the jury returned the verdict of acquittal as ordered on the codeine case, but convicted on the cocaine charge.[71] The only note sent by the jury during deliberations asked to listen again to the recordings of the men speaking in the car and to Floyd's confession.[72]

———————◆———————

---

[66] (RRIV-13-14, 65, 73-74).
[67] (RRIV-15-16, 75-76, 97-98).
[68] (RRIV-75-77).
[69] (RRIV-13-58, 83-84).
[70] (RRIV-107-108).
[71] (RRIV-111, 148).
[72] (CR-139).

# STATE'S GROUNDS FOR REVIEW

1. The Court of Appeals erred by finding the subjective beliefs of the testifying officer regarding exigency controlled over the totality of the circumstances objectively known to law enforcement when police searched appellant's cell phone.

2. The Court of Appeals misapplied the harm standard by finding a text message stating, "U got some oil" constitutionally harmful when it related only to the charge for which appellant was acquitted in the same trial.

———————◆———————

# REASONS FOR GRANTING REVIEW

The Court should grant this petition for discretionary review pursuant to Texas Rule of Appellate Procedure 66.3(c) because the Fourteenth Court of Appeals' opinion conflicts with this Court's decisions in *Brimage v. State* and *Snowden v. State*.[73]

———————◆———————

---

[73] *See Brimage v. State*, 918 S.W.2d 466, 501-02 (Tex. Crim. App. 1994) (*citing Garcia v. State*, 827 S.W.2d 937 (Tex. Crim. App. 1992); *Janicek v. State*, 634 S.W.2d 687, 691 (Tex. Crim. App. 1982)) (utilizing an objective standard of reasonableness when determining application of the emergency doctrine to justify warrantless search based on a reasonable police officer's beliefs under the circumstances not subjective beliefs of the searching officer); *see also Snowden v. State*, 353 S.W.3d 815 (Tex. Crim. App. 2011) (addressing the proper considerations on a harm analysis after constitutional error).

# STATE'S FIRST GROUND FOR REVIEW

**The Court of Appeals erred by finding the subjective beliefs of the testifying officer regarding exigency controlled over the totality of the circumstances objectively known to law enforcement when police searched appellant's cell phone.**

The Court of Appeals focused on the officer's failure to assert during his testimony that exigency caused him to search the phone.[74] It concluded from reviewing the testimony of the searching officer that exigent circumstances did not support the search.[75] Yet, it failed to consider the totality of circumstances collectively known to law enforcement that the trial judge had to consider at the hearing. As this Court has long held, a reviewing court uses an objective standard of reasonableness in determining whether a warrantless search is justified.[76] It applied that test when addressing the emergency doctrine, and the emergency doctrine is "considered synonymous with the exigent circumstances doctrine."[77] The exigent circumstances doctrine applies when police act in a "crime-fighting" role, whereas the emergency doctrine occurs when police act in their limited caretaking role to protect and preserve

---

[74] *Oliver*, slip op. at 4, 7 n. 5.

[75] *Id.* at 5-7.

[76] *See Brimage*, 918 S.W.2d at 501 (*citing Garcia*, 827 S.W.2d 937; *Janicek*, 634 S.W.2d at 691) (addressing standard when reviewing application of the emergency doctrine); *see also Laney v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003) (explaining the emergency doctrine is considered synonymous with the exigent circumstances doctrine) (*citing Brimage*, 918 S.W.2d at 500; *Colburn v. State*, 966 S.W.2d 511, 519 (Tex. Crim. App. 1998); 40 Dix & Dawson, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 12.11 (2d ed. 2001 & Supp. 2003)).

[77] *Laney*, 117 S.W.3d at 861 (citations omitted).

life.[78] The test for determining reasonableness of a warrantless search under either approach is still an objective one.[79]

In *Brimage v. State*, this Court considered all the information known to law enforcement at the time of the search, and concluded that "a reasonable police officer" could have believed an emergency existed.[80] It held the trial court could have found a reasonable possibility existed that the complainant was injured, in the home, and in need of assistance, which precipitated the search.[81] Unfortunately, despite that reasonable belief, the searching officer found the complainant deceased, but police had no reason to believe when they chose to conduct the search that she they would her deceased.[82] In its analysis, the *Brimage* Court focused not on the subjective beliefs of the searching officer, but instead rested its opinion on an objective standard of reasonableness that took into account all the facts and circumstances known to law enforcement when the officer conducted the search.[83]

Similarly, the United States Supreme Court held, "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as

---

[78] *Laney*, 117 S.W.3d at 861 (*citing Welch v. Wisconsin*, 466 U.S. 740, 750 (1984); *Mincey v. Arizona*, 437 U.S. 385, 392 (1978))(distinguishing exigent circumstances from emergency doctrine).

[79] *See Brimage*, 918 S.W.2d at 501; *see also Laney*, 117 S.W.3d at 861.

[80] *Id.* at 502.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 501-02.

long as the circumstances viewed *objectively*, justify [the] action.'"[84]  Therefore, "[t]he officer's subjective motivation is irrelevant."[85]  As it declared in *Bond v. United States*, "the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment…; the issue is not his state of mind, but the objective effect of his actions."  The Court explained that, "the subjective motivations of the individual officers…ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment."[86]  The Court has long analyzed warrantless entries and searches pursuant to these principles.[87]

The Fourteenth Court of Appeals' reliance on the searching officer's rationale improperly focused exclusively on his subjective motivations and explanation rather than considering the totality of the circumstances known to law enforcement at the time.  It failed to consider the additional evidence known to law enforcement upon talking to the men and learning they instructed unknown people to come to the scene.[88]  The judge heard on the recording the exchange between officers and the men when police learned of the calls, and heard police actively attempt to stop others from

---

[84] *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (*quoting Scott v. United States*, 436 U.S. 128, 138 (1978)) (emphasis original).

[85] *Id.* (*citing Bond v. United States*, 529 U.S. 334, 338, n. 2 (2000)).

[86] *Id.* (*quoting Graham v. Connor*, 490 U.S. 386, 397 (1989)).

[87] *See id.* at 402-406 (addressing reasonableness of warrantless entry into home when police perceived continuing violence inside the home and entered under an exigency exception and finding the actions "plainly reasonable.").

[88] (State's Exhibit No. 18).

coming to the scene.[89]  This discussion and concern arose after police took the two men, took more than $60,000 worth of narcotics, and more than $1,100 in cash into their custody.[90]  The recording objectively demonstrated that exigent circumstances existed.  But in response to this objective basis to support the search, the Court of Appeals stated only that the officer, "never testified that he searched the phone in an attempt to gain information that would help protect himself or others from harm."[91]  It instead considered the officer's testimony that he did not find the telephone itself "scary or harmful[.]"[92]  Yet, it failed to consider the totality of the circumstances known to all the officers at the scene when police conducted the search, and focused only on the subjective feelings of the testifying officer.[93]

In *State v. Sheppard*, this Court concluded the failure of an officer to articulate the valid reason and basis for the search does not defeat "the objective facts that the trial court found speak for themselves" namely that a reasonable and prudent officer would have had a valid basis to conduct the search.[94]  Rather, an officer's failure to articulate a lawful basis for the search or detention did not mean that he acted

---

[89] *See* (State's Exhibit No. 18) (commenting from officer after he relayed numbers from Floyd's phone, "I'm going to call [the person Floyd just called] and tell her not to come out here" and later questions to appellant about, "What's she doing on her way.  Did you call her?").

[90] (RRIII-77, 145-147, 149-150; RRIV-75).

[91] *Oliver*, slip op. at 7, n. 5.

[92] *Id.*

[93] *See id.*

[94] *State v. Sheppard*, 271 S.W.2d 281, 287 (Tex. Crim. App. 2008).

illegally.[95] Similarly, the searching officer's failure to perceive the immediate danger he was under did not defeat the objective basis that a reasonable and prudent officer would have had.[96] Law enforcement had a legitimate basis for searching the phone based on the exigent circumstances resulting from unknown people coming to the scene where police held two men under arrest, multiple bottles of codeine, cash, and more than half a kilo of cocaine worth quite a bit of money.[97]

The United States Supreme Court opinion in *Riley v. California* did not hold that warrantless searches of cell phone data were always unreasonable. Instead, the Court specifically noted that "the availability of the exigent circumstances exception…will…be able to address some of the more extreme hypotheticals that have been suggested[.]"[98] It expected each reviewing court "to examine whether an emergency justified a warrantless search in each particular case" and it reiterated that the test for any Fourth Amendment exception is "reasonableness."[99] The Court answered the government's assertions regarding the possibility of arrestees having "confederates…headed to the scene" by concluding that, "[t]o the extent danger to arresting officers may be implicated in a particular way in a particular case, they are

---

[95] *Id.* at 288 (*citing Unites States v. Wallen*, 388 F.3d 161, 167 (5th Cir. 2004)).

[96] *See id.*

[97] *See* (State's Exhibit No. 18).

[98] *Riley v. California*, __ U.S. __, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014).

[99] *Id.* at 2482 (*citing Missouri v. McNeely*, 569 U.S. ___, 133 S.Ct. 1552, 1559, 185 L.Ed.2d 696 (2013)).

better addressed through consideration of case-specific exceptions to the warrant requirement, such as the one for exigent circumstances."[100]

The Court of Appeals erred by failing to objectively consider the reasonableness of the exigent circumstances that supported the search and unduly relying on the subjective beliefs of one officer. The State requests that this Court grant the State's First Ground for Review, and upon hearing the merits, reverse the Fourteenth Court of Appeals.

———————◆———————

# STATE'S SECOND GROUND FOR REVIEW

**The Court of Appeals misapplied the harm standard by finding a text message stating, "U got some oil" constitutionally harmful when it related only to the charge for which appellant was acquitted in the same trial.**

The Court of Appeals misapplied the harm standard when it found the text message, "U got some oil" constitutionally harmful despite the evidence that oil referenced codeine, not the cocaine possession for which the jury convicted appellant. Rather than view the evidence as a whole and consider the potential impact of the text on just the cocaine charge, the Court took a piecemeal approach to the evidence in order to find the text constitutionally harmful.

---

[100] *Id.* at 2486 (*Warden Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967)).

The jury heard overwhelming evidence of appellant's guilt for possessing with the intent to deliver the more than 600 grams of cocaine found within arm's reach of him. The officer testified based on his training and experience the amount exceeded that which a person would possess for personal use.[101] The 654.7 grams appellant possessed was valued at over $60,000.[102] It looked as if taken "straight off the brick" because police found it in two large, hard chunks.[103] The cocaine had an odor, and police found it stored in a bag with multiple, manufacturer-sealed bottles of codeine.[104] The only other codeine in the car had appellant's name on the bottle, along with two prescription receipts in appellant's name, one of which was for codeine.[105] And, as a distinguishing factor from the overruled case relied upon by the Court of Appeals for the proposition that 654 grams of cocaine was not evidence of appellant's intent to deliver, appellant possessed more than $1,100 in small denominations of cash on his body when police arrested him providing additional evidence of intent to deliver.[106]

---

[101] (RRIII-74-75).

[102] *See* (RRIII-75; RRIV-70-71).

[103] (RRIII-72; RRIV-70-71).

[104] (RRIII-68-72; RRIV-71).

[105] (RRIII-61, 82-84; State's Exhibit No. 15, 16).

[106] *Compare* (RRIII-147)(appellant possessed $1,126 in twenties, tens, fives and ones) *with Oliver*, slip op. at 11-12) (*citing Carter v. State*, 419 S.W.3d 1 (Tex. App.—Amarillo 2009, pet. granted) *overruled by* 309 S.W.3d 31 (Tex. Crim. App. 2010)).

The jury also heard appellant and Floyd craft their story as they sat in the back of the patrol car.[107] Appellant told Floyd the amount of "work" he had in the car, a term commonly used by dealers for their dope, which showed Floyd did not know the amount he was supposed to have exclusively possessed.[108] Appellant told Floyd he had "like a half" indicating a half a kilo, similar to the 654 grams discovered.[109] The officer identified appellant's voice for the jury.[110] The very term appellant used to describe the cocaine, "work," demonstrated his intent to deliver because he possessed it as part of his "work" as a drug dealer.[111] Rather than consider the overwhelming evidence demonstrating his guilt, the Court focused on the sole piece of conflicting evidence, namely the false confession provided by Floyd after the jury heard the two men conspire to create it.[112]

The Court failed to consider the error in the context of the trial as a whole, or give the proper weight to the overwhelming evidence of guilt and the minimal relevance the text had on the cocaine case.[113] Instead, the Court focused not on the evidence, but on facts that it found lacking it claimed made the case less persuasive as

---

[107] (State's Exhibit No. 18).

[108] (RRIII-194; RRIV-7-8; State's Exhibit No. 18).

[109] (RRIII-142; State's Exhibit No. 18).

[110] (RRIII-141-142; State's Exhibit No. 18).

[111] *See* (RRIV-7-8).

[112] *Compare Oliver*, slip op. at 10 & n.7 ("However, the evidence was sharply controverted by Floyd's purposeful, self-incrimination.") *with* (State's Exhibit No. 18) (stating how appellant "won't do it again," Floyd could not "let [appellant] down," and Floyd would get "a probation though", whereas appellant could not "afford to go out like this" because he had "too much going on" before Floyd confessed his sole possession to police).

a whole. For example, it concluded from the lack of individualized packaging for the cocaine and the failure of the officer to mention it was an area known for drug dealing (despite testimony it was a high crime area) that appellant's intent to deliver was "not overwhelming."[114] Rather than consider what, if any, impact the text about codeine could have had on proving the cocaine case, it addressed the evidence in a piecemeal rather than cumulative manner.[115]

The Court of Appeals found the inculpatory comments made on the recording and those to the officer insufficient—in themselves—to show intent to deliver. It then found the more than 654 grams insufficient to show intent to deliver, it found the state of the cocaine in an undiluted "straight off the brick" state insufficient to show intent to deliver, and it found the five bottles of codeine, some of which were large manufacturer bottles, only evidence of use not sale.[116] From all that, it concluded the text "[a]lthough…not necessarily 'essential' to the State's case" still was reasonably likely to have materially affected the jury's deliberations.[117] In its analysis, the Fourteenth Court of Appeal erred by filing to consider "strictly to the question of whether the error committed in a particular case contributed to the verdict obtained *in*

---

[113] *See Oliver*, slip op. at 9-10

[114] *Id.* at 11-12, & n.8 (addressing additional factors a court might consider to find evidence of knowing possession with intent to deliver).

[115] *See Snowden*, 353 S.W.3d at 819.

[116] *See Oliver*, slip op. at 9-16.

[117] *Id.* at 16.

*that* case."[118] The Court misapplied the *Snowden v. State* factors by failing to analyze correctly the probable implications of an erroneous admission of the text message or the weight *this* jury was likely to have assigned to it during deliberations.[119] For example, the Court admitted that unlike the case upon which its analysis relied, the jury offered no note requesting the text, but instead sought only the inculpatory recording of the men and Floyd's confession.[120]

When reviewing the evidence collectively, clearly the text was not likely to have "move[d] the jury from a state of non-persuasion to a state of persuasion on any material issue in the case" including a finding that he intended to deliver the cocaine.[121] The Court of Appeals misanalysed the *Snowden* factors and improperly concluded harm resulted from the text. Accordingly, the State respectfully requests that this Court grant its second ground for review, and after consideration on the merits, reverse the Court of Appeals.

——————————◆——————————

---

[118] *Snowden*, 353 S.W.3d at 821 (emphasis original).

[119] *Compare id.* at 822-25 (reanalyzing the remaining *Harris* factors in light of the extent of the error found) *with Oliver*, slip op. at 9-16 (utilizing the *Snowden* factors, but finding harm under a constitutional standard despite the minimal impact of the text on the cocaine case).

[120] *Id.*

[121] *See Snowden*, 353 S.W.3d at 825.

## PRAYER

The State respectfully requests this Court grant the State's petition for discretionary review on both issues, consider the merits, and reverse the decision of the Fourteenth Court of Appeals.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ *Jessica Caird*

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
1201 Franklin Suite 600
Houston, Texas 77002
(713) 755-5826
Texas Bar No. 24000608
caird_jessica@dao.hctx.net

# CERTIFICATE OF SERVICE AND WORD LIMIT COMPLIANCE

This is to certify: (a) that the word count of the computer program used to prepare this document reports that there are **4,416** words in the document in compliance with Texas Rule of Appellate Procedure 9.4(i); and (b) that a copy of the foregoing instrument is being served by EFileTexas.Gov e-filer to the following email addresses on February 13, 2015:

Chip Lewis
Attorney at Law
2120 Welch
Houston, Texas  77019
chiplewis@aol.com


Lisa C. McMinn
State Prosecuting Attorney
P. O. Box 13046
Austin, Texas  78711
Lisa.McMinn@SPA.texas.gov


/s/ *Jessica Caird*

**JESSICA CAIRD**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
Texas Bar No.  24000608
caird_jessica@dao.hctx.net

# APPENDIX A

(The Court of Appeals' Opinion)

**Reversed and Remanded and Memorandum Opinion filed January 22, 2014.**



**In The**

## Fourteenth Court of Appeals

_____

**NO. 14-13-00957-CR**

_____

**CORREY OLIVER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1346323**

## M E M O R A N D U M   O P I N I O N

The State indicted appellant Correy Oliver for (1) the possession with intent to deliver cocaine weighing 400 grams or more[1] and (2) the possession with intent to deliver a compound, mixture, or preparation containing not more than 200 milligrams of codeine per 100 milliliters of non-narcotic active medicinal

---

[1] *See* Tex. Health & Safety Code Ann. §§ 481.102(3)(D), 481.112(f).

ingredients weighing 400 grams or more.[2]  The trial court directed a verdict of not guilty on the codeine charge, and the jury found appellant guilty on the cocaine charge.  The court sentenced appellant to an agreed punishment of forty-five years' confinement.

Appellant contends the trial court reversibly erred by denying his motion to suppress evidence discovered as a result of the warrantless search of his cell phone. We reverse the trial court's judgment and remand for a new trial.

### WARRANTLESS SEARCH OF CELL PHONE

In his first issue, appellant contends the trial court reversibly erred by denying his motion to suppress evidence of a text message on appellant's cell phone, which a police officer found during a warrantless search of the phone.  The State contends the search was justified by exigent circumstances—"to avoid the imminent destruction of evidence"—and that in any event, the error was harmless. We hold that the trial court erred by admitting evidence of the text message, and we must reverse the trial court's judgment because we cannot determine beyond a reasonable doubt that the error did not contribute to appellant's conviction.

### A.     Standard of Review

We apply a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing de novo the court's application of the law of search and seizure under the Fourth Amendment. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  We view the evidence in the light most favorable to the trial court's ruling, and we assume that the trial court made implicit findings of fact supported in the record that buttress the court's conclusion. *Id.* at 328.  Unless it would be a manifest injustice, we will

---

[2] *See* Tex. Health & Safety Code Ann. §§ 481.105(1), 481.114(e).

affirm a trial court's ruling on a motion to suppress if it is correct under any theory of law that is applicable to the case. *State v. Esparza*, 413 S.W.3d 81, 89–90 (Tex. Crim. App. 2013).

## B. Law Regarding Search of Cell Phones

While this appeal was pending, the United States Supreme Court held that under the Fourth Amendment's prohibition of unreasonable searches, a person's cell phone may not be searched incident to arrest. *Riley v. California*, 134 S. Ct. 2473, 2494 (2014). Generally, a cell phone may be seized incident to arrest, but police must get a warrant to search it. *Id.* at 2495. One exception to the warrant requirement, however, is "when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 2494 (quotation omitted; alteration in original). One such exigency could be "the need to prevent the imminent destruction of evidence." *Id.* Another could be the need to assist persons who are "threatened with imminent injury." *Id.* (citing as examples "a suspect texting an accomplice who, it is feared, is preparing to detonate a bomb or a child abductor who may have information about the child's location on his cell phone"). The State has the burden to establish that an exigency existed; if the State does not, "then a warrantless [search] will not withstand judicial scrutiny." *Gutierrez v. State*, 221 S.W.3d 680, 685–86 (Tex. Crim. App. 2007).

## C. Evidence Regarding the Search and Exigent Circumstances

Houston Police Department Officer Andrew Wright stopped a car driven by Michael Floyd. Appellant was a passenger in the front seat. The car was registered to appellant and his girlfriend. In plain view in the front cup-holder area of the car, Wright saw a prescription bottle, a bottle of red Sunkist soda, and two Styrofoam cups with ice. Wright believed the prescription bottle contained

3

codeine cough syrup because people who drink it commonly mix it with fruity red soda.[3] Floyd consented to a search of the vehicle, and appellant did not object. Wright and another officer detained Floyd and appellant in separate vehicles.

Wright testified that he observed appellant touching the buttons on an open, flip-style cell phone, so he took the phone from appellant and put in in a patrol car where it "would be difficult for him to get." The search of the vehicle revealed a bag behind the driver's seat containing 654 grams of cocaine and multiple bottles of codeine cough syrup. After Wright arrested appellant, Wright searched the phone "incident to arrest."[4]

Wright did not testify that an exigency caused him to search the phone. Wright testified that once the phone was seized, appellant did not have any opportunity to try to take the phone back or do anything with the phone. Wright also testified that he could have disabled the phone and obtained a warrant:

> Q. Okay. Flip phones are sort of older technology. Do you think—you could have figured out how to turn this phone off pretty easily, right?

---

[3] At some point, Wright examined and smelled the bottle, and he opined that the bottle contained codeine.

[4] Wright testified,

Q [the State]. At that point, without going into details, did you search the cell phone that Correy Oliver had on him?
A. Yes, I did.
Q. Was that a search incident to arrest?
A. Yes, it was.
. . . .
Q [defense counsel]. And you did that—once you arrested Mr. Oliver, you just searched it incident to arrest?
A. That's correct.
. . . .
Q [the State]. And after you had Correy Oliver, this defendant, under arrest, did you search that phone search [sic] incident to arrest?
A. Yes, I did.

4

A. Probably just take out the battery.

Q. Exactly. And that disables the phone, correct?

A. Right.

Q. Sometimes phones have cards or something that you can take out as well, correct?

A. Right.

Q. Okay. All of that would have stopped the phone from doing anything, from being a phone at all, correct?

A. Yes.

. . . .

Q. There was nothing preventing you from getting a warrant?

A. No, there was not.

Q. Turning off the phone would have disabled it so that nothing could have happened to it between the time you got the warrant and were able to search it?

A. Yes.

Wright testified that he found a text message sent to appellant, and Wright took a picture of it. Over appellant's objection, the trial court admitted this picture—Exhibit 7—as evidence. The text message reads, "U got some oil[.]" Wright testified that "oil" is slang for codeine cough syrup. And although there is no punctuation, Wright testified that based on his training and experience, the text message indicated, "Someone was asking him if he had any codeine syrup."

**D.      Error to Admit Text Message**

The State contends the trial court could have found that exigent circumstances justified the warrantless search of appellant's cell phone because of the need "to avoid the imminent destruction of evidence." The State acknowledges Wright's testimony that the phone could have been disabled, but the State argues that disabling the phone "did not mean that the deleted items would remain

5

recoverable or that it could later be reinstated to a working phone with the information intact." The State contends that "appellant proffered no evidence that [disabling the phone] would have retained the information already deleted or rendered the phone operational when the officer later replaced the [SIM card or battery]." Ultimately, the State contends,

> The lack of knowledge about what disabling the phone would do, or even closing the opened flip phone he held (much less removing the memory card) could do to it, along with appellant's manipulations of the phone, created exigent circumstances from which the trial court could conclude the search was immediately necessary to prevent the destruction of evidence.

Initially, we note that it was the *State's* burden to prove exigency, not appellant's burden to prove a lack of exigency. *See Gutierrez*, 221 S.W.3d at 685–86. Accordingly, the lack of evidence in this record concerning Wright's knowledge about the effects of disabling the phone does not help prove that exigent circumstances existed.

Regardless, the Supreme Court addressed some of the State's practical concerns in *Riley*. The Court noted that "once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone." 134 S. Ct. at 2486. Here, Wright acknowledged that appellant had no opportunity to delete data from the phone after Wright seized it. Further, the Supreme Court explained that if an officer seizes a phone in an unlocked state, as Wright did, the officer may be able to disable a phone's locking feature to prevent locking and the encryption of data. *See id.* at 2487. An officer can prevent a remote wipe of the phone's data by "disconnecting a phone from the network" in at least two simple ways: turning the phone off or removing the battery. *Id.* So, under appropriate circumstances, officers may take measures to preserve data on a phone without resorting to

6

searching it. *See id.* The Supreme Court's "answer to the question of what police must do before searching a cell phone seized incident to arrest is accordingly simple—get a warrant." *Id.* at 2495.

Here, the trial court did not find that exigent circumstances justified the warrantless search of appellant's cell phone, and based on this record, no rational jurist could so find. Wright testified multiple times that he searched the phone "incident to arrest," and there was "nothing" preventing him from getting a warrant. Appellant had no opportunity to delete data himself once the phone was seized, and "[t]urning off the phone would have disabled it so that nothing could have happened to it between the time [Wright] got the warrant and [would have been] able to search it." Wright never testified about any of the concerns that the State now raises for the first time on appeal.[5]

Accordingly, the trial court erred by admitting the evidence gathered from the warrantless search of appellant's cell phone.

## E. Harm

Appellant and the State agree that this error is constitutional, and therefore, we must reverse appellant's conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction." Tex. R. App. P. 44.2(a). This standard for determining harmful error "should ultimately serve to vindicate

---

[5] For the first time at oral argument, the State suggested that exigent circumstances existed because appellant and Floyd were "calling their posse to the scene, . . . actively seeking to have people come and complicate an arrest situation." Although courts have recognized exigent circumstances for the purpose of "protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous," *Gutierrez*, 221 S.W.3d at 685, Wright never testified that he searched the phone in an attempt to gain information that would help protect himself or others from harm. In fact, he testified that he was not in fear for his safety, and there were no circumstances regarding the phone that he found scary or harmful to himself. "Nothing" prevented Wright from obtaining a warrant. Accordingly, the State failed to adduce evidence of exigent circumstances based on an alleged desire for Wright to protect himself or others from danger.

7

the integrity of the fact-finding process rather than simply looking to the justifiability of the fact-finder's result." *Snowden v. State*, 353 S.W.3d 815, 819 (Tex. Crim. App. 2011).

Accordingly, we must focus "not upon the perceived accuracy of the conviction or punishment, but upon the error itself in the context of the trial as a whole, in order to determine the likelihood that it genuinely corrupted the fact-finding process." *Id.* We focus not on "whether the jury verdict was supported by the evidence," but rather, on whether "the error adversely affected the integrity of the process leading to the conviction." *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (quotation omitted). We must "focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *overruled on other grounds by Snowden*, 353 S.W.3d at 821–22; *accord Daniels v. State*, 25 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

So, an error is not harmless "simply because the reviewing court is confident that the result the jury reached was objectively correct." *Snowden*, 353 S.W.3d at 819. Error is not harmless "if there is a reasonable likelihood that it materially affected the jury's deliberations." *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). Nor is error harmless if it "disrupted the jury's orderly evaluation of the evidence." *Walker v. State*, 180 S.W.3d 829, 835 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Harris*, 790 S.W.2d at 588).

To determine whether constitutional error was harmless, we must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Neal*, 256 S.W.3d at 284. Accordingly, the presence of "overwhelming evidence of guilt is a factor to be considered." *Motilla v. State*, 78

8

S.W.3d 352, 357 (Tex. Crim. App. 2002). Other factors to consider may include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden*, 353 S.W.3d at 822. These are not exclusive considerations or even necessary considerations in every case. *See id.* "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (alteration in original) (quoting Tex. R. App. P. 44.2(a)). We examine the entire record "in a neutral, impartial and even-handed manner and do not make our examination 'in the light most favorable to the verdict.'" *Daniels*, 25 S.W.3d at 899 (quoting *Harris*, 790 S.W.2d at 586); *see also Tillman v. State*, 376 S.W.3d 188, 202 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

We begin the analysis by reviewing the evidence of appellant's guilt. The evidence of appellant's possession with intent to deliver cocaine, viewed in isolation, was strong indeed: (1) a secretly recorded conversation between appellant and Floyd demonstrated appellant's knowledge of the presence of the cocaine when he told Floyd there was "about a half" of a kilogram of cocaine in the car; (2) appellant had over $1,100 in small denomination bills on him at the time of the arrest, which indicated to Wright that appellant was "selling small quantities of narcotics or making change for other people buying"; (3) the car was registered to appellant and his girlfriend, not Floyd; (4) the cocaine was within easy reach of appellant, having been found in a bag behind the driver's seat; (5) the cocaine weighed 654 grams and was worth about $60,000 on the street; (6) appellant was linked to several bottles of codeine cough syrup found in the same

9

bag as the cocaine because a bottle of codeine was in plain view in the front seat, and the officers found a six-month-old prescription for codeine cough syrup in appellant's name in the car; and (7) after appellant was informed he was being arrested for possession of cocaine and codeine and was told his money would be seized, appellant said, "I'm going to keep doing what I do no matter what you do," which Wright understood as, "He's going to keep selling drugs and trying to make money no matter if he gets arrested and charged."[6] However, the evidence was sharply controverted by Floyd's purposeful, self-incrimination. Floyd gave a recorded, Mirandized statement to Wright that he had borrowed the car from appellant the night before, that all the drugs were Floyd's, and that he put the drugs in the car before picking up appellant. [7]

---

[6] This statement may be a "persuasive admission of personal involvement," but it is not necessarily an "explicit admission of guilt." *See Hutchinson v. State*, 424 S.W.3d 164, 184 (Tex. App.—Texarkana 2014, no pet.) (referencing a statement made by a defendant after he was detained and told he would be arrested and his house searched, "I've just been doing what I've been doing for a little extra money"; reversing for constitutional error despite "relatively strong" evidence linking the defendant to 11.58 grams of methamphetamine, 32.51 grams of GHB, and some Xanax pills; evidence included the admissible statement quoted above, the defendant had $1,600 in cash on his person, he lived at the residence where drugs were found, he gave keys to police officers that unlocked his bedroom where the officers found the drugs; the State twice referenced appellant's second, inadmissible statement during closing arguments).

[7] The State undermined Floyd's confession with evidence that it was contrived and instigated by appellant. Before Floyd confessed, the officers had placed appellant and Floyd in the back of a patrol car together where their conversation was secretly recorded. Although appellant and Floyd were "talking pretty quiet" and "mumbling" according to Wright, Wright identified appellant as saying "I got you." Appellant also said, "I can't go down," and, "You would get probation." Floyd asked, "How much work was in that [expletive]," and appellant responded, "About a half." (Testimony at trial established that "work" is slang for cocaine.) Appellant then said, "I got you, though . . . . When you dropped me off last night, you put it in there. You hear me?" Floyd said, "I got you." Appellant and Floyd then used a different cell phone (unbeknownst to the police officers at the time) to call someone. Appellant told Floyd, "Just tell them everything," and Floyd said, "I got you, I got you." Floyd told someone on the phone, "All that [expletive] was mine that I had with us," and Floyd said he had "a half of a whole." Floyd said he was going to tell the police "it was mine."

10

Thus, the evidence of appellant's possession with intent to deliver the cocaine was not overwhelming. Courts have considered several factors for measuring the weight of the evidence concerning an intent to deliver a controlled substance, such as: (1) the nature of the location at which the accused was arrested (whether an area known for drug dealing); (2) the quantity of contraband in the accused's possession; (3) the manner of packaging (whether packaged in individual units for resale); (4) the presence or lack thereof of drug paraphernalia (whether for use or sale); (5) the accused's possession of large amounts of cash (particularly in amounts indicative of drug sales); and (6) the accused's status as a drug user. *See Moreno v. State*, 195 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *see also Carter v. State*, 419 S.W.3d 1, 18 (Tex. App.—Amarillo 2009), *rev'd on other grounds*, 309 S.W.3d 31 (Tex. Crim. App. 2010).

The State contends that the "sheer volume" of cocaine was "sufficient evidence to demonstrate appellant's intent to deliver." But the test is not merely one of weight or sufficiency; we are concerned with the likelihood that the admission of the text message corrupted the fact-finding process, affected the integrity of the process leading to the conviction, or prejudiced the jurors' decision-making. *See Snowden*, 353 S.W.3d at 819; *Langham*, 305 S.W.3d at 582; *Harris*, 790 S.W.2d at 586.

In considering the remaining evidence, or lack thereof, about possession with an intent to deliver, we note that there was no evidence that Floyd and appellant were stopped in an area known for drug dealing although the area was "high crime." The cocaine was not packaged in individual units for resale, nor was there any evidence of other drug-distribution paraphernalia found in appellant's car (or any other location) that would have indicated an intent to deliver, such as baggies or measuring devices. Accordingly, the evidence of guilt was not

11

overwhelming. *See Carter*, 419 S.W.3d at 18 & n.19 (reasoning that, other than the defendant's confession, there was "virtually no evidence" establishing the defendant's intent to deliver; holding error harmful when there were 491 grams of cocaine found in a vehicle with a passenger and a driver, and there was no evidence the defendant possessed an excessive amount of cash, that the cocaine was packaged in a manner indicating an intent to sell, that the defendant possessed any baggies, scales or other items used in drug transactions, that the defendant was arrested in an area known for drug sales, that the defendant had any weapons in the car, or that the defendant attempted to flee).[8]

Further, there was drug paraphernalia indicative of appellant's personal use of the codeine cough syrup. Wright testified that he observed a small prescription bottle of codeine in appellant's name, two cups of ice, and a red fruity beverage bottle in the front cup-holder area of the car. These items were consistent with drug *use* according to Wright: "Typically they will mix the codeine with some kind of fruity soda beverage, and a lot of times they choose a fruity beverage that is red so that the color won't have changed that much if you pour codeine in it." The State elicited Wright's opinion, based on his training and experience, that the text message indicated, "Someone was asking him if he had any codeine syrup." Thus, the text message and Wright's opinion provided evidence that appellant was a drug dealer, rather than merely a drug user.

Despite the trial court directing a "not guilty" verdict on the codeine charge, the State relied on the text message during closing argument. First, the State

---

[8] Viewing the record in a neutral light, we disagree with the State's contention on appeal that "the appearance of the cocaine indicated it was meant to be delivered to someone else rather than possessed for appellant's own use." The State cites Wright's testimony that the cocaine was "straight off the brick" and "not broken up or diluted in any way." But Wright did not opine that this appearance indicated an intent to deliver. Such an intent perhaps could have been shown if the cocaine *had* been broken up into smaller quantities and diluted, ready for resale.

12

rebuffed defense counsel's suggestion that the text message was not incriminating, arguing:

> You got oil. I guess he works for BP. I mean, my goodness, if you've got—if your car is low on oil and you need some, just text [appellant]. He'll get it for you. No problem. Come on. You know, it's common sense. What did Officer Wright tell you was one of the nicknames of codeine? Oil. Doesn't take a rocket scientist to figure it out.

After referencing the amount of cocaine appellant possessed, the State argued, "You want to tell me that's not intent to deliver? You got oil. Unfortunately there's nothing else we can bring you other than that, and it's enough." Accordingly, the State invited the jury to infer that because appellant intended to deliver codeine, he also intended to deliver the cocaine found in the same bag as the codeine.

On appeal, the State contends the "oil" text was of little significance because it contained no punctuation and there was "no clear indication that it referred to codeine." But that argument directly contradicts the State's evidence and its argument to the jury at the close of the case. Further, the State contends that the State mentioned the text during closing argument "only after defense counsel chose to mention it" first. But defense counsel's attempt during closing argument to lessen the impact of the inadmissible evidence does not mean appellant suffered any less harm—in fact, it cuts the other way because a "probable implication" or "collateral consequence" of error in the admission of evidence is naturally that defense counsel will attempt to mitigate the effect of harmful, relevant evidence during closing argument. *See Hutchinson v. State*, 424 S.W.3d 164, 182, 184 (Tex. App.—Texarkana 2014, no pet.) (noting that courts must consider "probable collateral consequences" of the error) (citing *Snowden*, 353 S.W.3d at 822; *Higginbotham v. State*, 807 S.W.2d 732, 737 (Tex. Crim. App. 1991)). That both

the State and defense counsel discussed the inadmissible evidence suggests the error might possibly have prejudiced the jurors' decision-making or disrupted the jury's orderly evaluation of the evidence. *See Harris*, 790 S.W.2d at 586, 588.

In sum, the text message helped the State paint a clearer picture of appellant's possession with intent to deliver cocaine, and that is precisely the argument the State made to the jury. The text message connected appellant, as opposed to Floyd, to the distributable quantity of cocaine and a cell phone solicitation for distribution. The text message was "important in the context of the entire trial." *See Cabrales v. State*, 932 S.W.2d 653, 657–59 (Tex. App.—Houston [14th Dist.] 1996, no writ) (reversing the defendant's conviction under the beyond-a-reasonable-doubt harm analysis when an officer improperly testified that the cocaine could be cracked out and worth $60 million whereas the powder cocaine appellant was charged with possessing with intent to deliver was worth only $15 million; the defendant was the passenger in a vehicle driven by another person, wherein officers found four locked duffle bags containing 78 packages of cocaine weighing about 150 kilograms; the defendant had engaged in activity consistent with drug activity, i.e., keeping a lookout after the drugs were presumably loaded into the vehicle, and the defendant "directed the officers to the hidden keys which unlocked the bags" of cocaine; this court found harm because the evidence was "important in the context of the entire trial," where the State had argued that the defendant knew "what was going on" based on the fact that the vehicle contained drugs worth up to $60 million).[9]

---

[9] Although appellant and the State do not squarely address the issue, appellant was charged under the law of parties, so the jury could have convicted him if he was criminally responsible for Floyd's possession of the cocaine with intent to deliver. Just as the text message supported the State's theory that appellant had an intent to deliver cocaine, it would have supported the State's theory that appellant had the intent to promote or assist Floyd's

14

The sole case the State cites in support of its argument on harm is *Neal v. State*, where the Court of Criminal Appeals held that the admission of a gun and Blockbuster card did not contribute to Neal's conviction for capital murder. *See* 256 S.W.3d at 284. The case is inapposite. Neal had confessed to raping and murdering the victim. *Id.* at 277. Cruz, the accomplice, testified about the rape and murder "in great detail at trial, from the conception of their plan through its execution, as well as the aftermath in which she confessed to the police and led them to [the] body." *Id.* Neal also gave a general account of the rape and murder to his cellmate. *Id.* The evidence presented a "clear picture" that appellant abducted the victim, stole some of her valuables, raped her, and fatally shot her several times. *Id.* Fingerprint and DNA evidence linked him to the crime. *Id.* The inadmissible gun was not the murder weapon, but Cruz had used it to hold-up the victim. *Id.* at 283. At trial, the State had Cruz demonstrate how she held the gun. *Id.* The Court of Criminal Appeals found the admission of the gun and Blockbuster card harmless because, although the examination of Cruz regarding the gun "may have added a dramatic flourish at trial," the testimony was brief, the evidence of Neal's guilt was overwhelming, the handgun was not essential to the State's case, and the Blockbuster card "was of little significance." *Id.* at 284.

Unlike in *Neal*, however, here the text message was an item of evidence, among others, that the jury might well have considered in reaching the conclusion that appellant possessed the cocaine with the intent to deliver it or intended to promote or assist Floyd's possession with intent to deliver.[10] Appellant cites this court's prior decision in *Johnson v. State*, which is somewhat more analogous. *See*

---

commission of the crime and, at a minimum, was attempting to aid Floyd's commission of the crime.

[10] The jury charge also allowed the jury to convict appellant under the theory of the law of parties. *See* Tex. Penal Code Ann. § 7.02 (a)(2).

15

899 S.W.2d 250 (Tex. App.—Houston [14th Dist.] 1995, no writ). In *Johnson*, an officer photocopied a $10 bill. *Id.* at 252. When the officer knocked on the door to a residence to make an undercover drug purchase, Johnson answered and asked the officer what he needed. *Id.* The officer said a "dime," which is street slang for one-eighth of a gram of cocaine. *Id.* Johnson told Harden, the State's accomplice witness, to get the officer "what he wanted." *Id.* Harden took a rock of cocaine from the table in the living room and gave it to the officer. *Id.* The officer paid Harden the $10 bill. *Id.* After the officer left, the police raided the apartment without a warrant. *Id.* When the police searched Johnson, the $10 bill was found in his pocket. *Id.* He was tried for the delivery of cocaine. *Id.* The State referenced the $10 bill during closing argument and referenced Harden's testimony that he gave the $10 to Johnson because the drugs belonged to Johnson. *Id.* The jury also sent notes during deliberations "requesting copies of the testimony about the seizure of the ten dollar bill from appellant." *Id.* at 252–53. Despite the testimony from Harden and the undercover officer, this court reversed Johnson's conviction because the $10 bill was "essential" to corroborate their testimony and it seemed clear that the evidence of the $10 bill "prejudiced the juror's decision-making process and disrupted their orderly evaluation of the evidence." *Id.*

Although there is no jury note in this case comparable to the one in *Johnson*[11] and the text message was not necessarily "essential" to the State's case, after reviewing the entire record, we hold there is a reasonable likelihood that the error materially affected the jury's deliberations and disrupted the jury's orderly evaluation of the evidence. We cannot conclude beyond a reasonable doubt that the error in admitting evidence from the warrantless search of appellant's cell phone did not contribute to appellant's conviction.

---

[11] Here, the jury asked for copies of the recordings of Floyd's confession and the secretly recorded discussion between Floyd and appellant.

Appellant's first issue is sustained.

## CONCLUSION

Having sustained appellant's first issue, we reverse the trial court's judgment and remand for a new trial.[12]


/s/    Sharon McCally
        Justice

Panel consists of Justices McCally, Brown, and Wise.

Do Not Publish — Tex. R. App. P. 47.2(b).

---

[12] Because we sustain appellant's first issue, we do not address appellant's second issue concerning the Confrontation Clause. *See* Tex. R. App. P. 47.1.